UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

----------------------------X
                            :
UNITED STATES OF AMERICA,   :
                            :    CR-08-76 (NGG)
        v.                  :
                            :    February 19, 2008
FRANK CALI,                 :
                            :    Brooklyn, New York
            Defendant.      :
                            :
----------------------------X


TRANSCRIPT OF CRIMINAL CAUSE FOR DETENTION HEARING
BEFORE THE HONORABLE JOAN M. AZRACK
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the Government:        BENTON J. CAMPBELL, ESQ.
                           UNITED STATES ATTORNEY
                           BY: JOEY LIPTON, ESQ.
                           ASSISTANT U.S. ATTORNEY
                           225 Cadman Plaza East
                           Brooklyn, New York  11201


For the Defendant:         HARLAN J. PROTASS, ESQ.




Audio Operator:


Court Transcriber:         ARIA TRANSCRIPTIONS
                           c/o Elizabeth Barron
                           31 Terrace Drive, 1st Floor
                           Nyack, New York 10960
                           (215) 767-7700



Proceedings recorded by electronic sound recording,
transcript produced by transcription service

1          THE CLERK:  Criminal cause for detention hearing,

2    U.S.A. versus Frank Cali.  Counsel, state your names for the

3    record.

4          MR. LIPTON:  Good morning, your Honor.  Joey

5    Lipton for the government.

6          MR. PROTASS:  Good morning, your Honor.  Harlan

7    Protass for the defendant, Frank Cali.

8          THE COURT:  Good morning.  Okay, Mr. Lipton.

9          MR. LIPTON:  Yes, Judge.  We're here before you

10   today for a bail hearing, and the government is seeking a

11   permanent order of detention.

12         THE COURT:  This is the first bail hearing on Mr.

13   Cali.

14         MR. LIPTON:  Yes, it is, your Honor.  He was

15   arraigned last week, on the 27th, and a temporary order of

16   detention was entered, with leave to come back to argue with

17   a bail package.

18         Mr. Cali is charged with extortion and extortion

19   conspiracy in two counts, specifically Counts 38 and 39, in

20   the indictment.  Although he's not charged in the RICO, both

21   of those crimes constitute crimes of violence.

22         He's alleged, in the indictment, to be an acting

23   captain in a violent criminal family.  The purpose of that

24   family, the Gambino family, is to generate money through

25   criminal activity, as alleged in the indictment.  The family

Case 1:08-cr-00076-JBW   Document 283   Filed 02/20/08   Page 3 of 35 PageID #: 900

furthers its activities by using and threatening to use force and economic harm, including murder and other violent crimes.

The government will prove that Frank Cali, before even turning forty years old, became an acting captain in the family, a position that's usually achieved in mob circles for organized crime members much later in their careers.

He holds a significant position, not only because he's an acting captain, but because he's acting for Jack D'Amico, who is the acting boss of the family. And he became an acting captain when Jackie D'Amico was elevated to acting boss of the family, in the mid-2000's, approximately 2005.

Four cooperating witnesses, who are former members of the Gambino family, will testify as to Frank Cali's significant and lucrative criminal activities in the 1990's. They will testify as to his familial and blood ties to the Gambino family, that he was a made member in the late '90s and that he had a swift promotion to acting captain in less than ten years from when he became a member. They will also testify to his very close relationship with Jackie D'Amico.

Recordings will also establish Frank Cali's position in the family. For example, in November of 2002, Frank Cali was intercepted meeting with a captain in the

```
 1    Gambino family, Michael DiLeonardo, who was surreptitiously
 2    recording the conversation at that time.  At the time, Cali
 3    was a member in the family and DiLeonardo was a captain.  So
 4    even before he became an acting captain, he was discussing
 5    in that recording family business and administration
 6    business, and all the while, Michael DiLeonardo was on court
 7    supervision, as far as Frank Cali knew, during that
 8    conversation.
 9            Specifically, in the conversation, Cali
10    discusses --
11            THE COURT:  What year is this?
12            MR. LIPTON:  It's November, specifically November
13    27th, 2002.  He's discussing that Gambino captain John Rizzo
14    has been elevated to the administration of the Gambino
15    family.  Cali -- this is his words:  "So when I heard that,
16    I said, Pete" -- and I'll fill in what the government
17    proffers he's talking to, Pete Inzerillo (ph) -- "I said, go
18    see Johnny Rizzo", the Gambino captain they're referring to.
19            "I didn't hear anything.  I mean, I've seen Jo
20    Jo", referring to Jo Jo Corozzo, the consigliere of the
21    Gambino family.  Tony, Tony Megli (ph), who is also the
22    person they're talking about, who is a captain:  "I seen
23    everybody but I never heard anything.  You know, I heard and
24    I says, go see Tony", referring to Tony Megli, "Go see
25    John", referring to John Rizzo, "because Jon, they took him
```

1   away from there."

2           DiLeonardo replies, "Yeah, where did they put

3   him?"

4           "Cali:  They put him, uh, the administration",

5   referring to the administration of the Gambino family.

6           "DiLeonardo:  That's the move.  That's this Little

7   Jo Jo", referring to Jo Jo Corozzo.

8           "Cali:  And?"

9           "DiLeonardo:  I've got some advice for you.  Run

10  for the f'ing hills.  These guys are bad buys, Frank.  Yeah,

11  now I see the move."

12          "Cali:  And I said, Pete, go to John", referring

13  to Pete Inzerillo and John Rizzo.  "Let's see what happened,

14  what's going on.  What did you do?  Just go feel them out

15  because I won't go, John.  I really haven't been talking."

16          "Yeah, you never talked to him?  What do you

17  mean?"

18          "Cali:  And but I wanted to know what was going on

19  'cause I didn't hear nothing and I haven't seen Jo Jo",

20  referring to Corozzo, "lots of times, I wasn't --"

21          "DiLeonardo:  I never met -- you know how good

22  friends we are."

23          "Cali:  And the other guy, Tony, was there that

24  night", Tony Meglia.

25          "DiLeonardo:  Who's Tony?"

1          "Cali:  Tony Meglia."

2          "DiLeonardo:  What happened to the other guy?

3   They threw him out?"

4          "Cali:  Arnold?", referring to the former street

5   boss of the Gambino family, Arnold Spateri (ph).

6          "DiLeonardo:  Good."

7          "Cali:  No, the --"

8          "DiLeonardo:  Okay."

9          "Cali:  He's from Connecticut, that Tony guy",

10  referring to Tony Meglia.  He's referred to as "Tony from

11  Connecticut".

12         "DiLeonardo:  Oh, yeah?"

13         "Cali:  He was with Pete, a friend of Pete Gotti.

14  And so I sent Peter", referring to Inzerillo, "the job.

15  Peter comes back to me and says, no, John", referring to

16  Rizzo, "said that Tony", referring to Meglia, "told him."

17         "DiLeonardo:  Not Jo Jo?"

18         "Cali:  No, he says Tony told him."

19         Cali, later on in the conversation:  "Now, listen,

20  you know you got me out there."

21         "DiLeonardo:  I know."

22         "Cali:  You know what?  You got me out there.  In

23  other words, just call if you need me to do something."

24         "DiLeonardo:  Okay."

25         "Cali:  What do you want me to do with John?"

1    referring to Rizzo.  "Do you want to see him?  Do you want

2    me to send Pete?" referring to Inzerillo.

3          The government proffers that this conversation

4    relates to Cali telling DiLeonardo that he had Gambino

5    soldier Peter Inzerillo, who is Frank Cali's second cousin,

6    talk to Gambino captain John Rizzo, who heard from Gambino

7    member Anthony Meglia, and not from Jo Jo Corozzo, that

8    Rizzo had been elevated to the administration of the Gambino

9    family, and that former street boss Arnold Spateri was no

10   longer part of the administration.  At the end, Cali asks

11   about making a meeting between Rizzo and DiLeonardo.

12         A second example showing Cali's position in the

13   family is in January of 2006, in an intercepted call from

14   now convicted Gambino soldier Mikey "Mickey Boy" Paradiso,

15   in which Paradiso, in an urgent matter, says he needs to get

16   in touch basically with the administration, the top guys,

17   either "Jackie Nose", referring to Jackie D'Amico, or "Jo

18   Jo", referring to Joseph Corozzo, who in 2006 was the acting

19   boss and a consigliere.

20         He tells his associate -- this is Paradiso telling

21   his associate, Frank Romano, get in touch with Frank Cali

22   because it's Frank Cali that has to get in touch with the

23   administration.

24         Specifically, it's from January 17th, 2006.

25   Gambino family captain, long-term captain "Mickey Boy"

1    Paradiso says, "And I depend on it.  I can't because if I

2    gotta give some Friday and I'm gonna do that, I'm gonna tell

3    him that today.  And I gotta reach Jo Jo Corozzo, so, uh,

4    Frank Cali.  Tell him either him or Jackie Nose.  I have to

5    see one of them within 24 hours.  What I talked about, I

6    wanna see one of them in 24 hours, not -- or Jackie.  I'd

7    rather see Jo Jo but Jackie's alright.  I have to see them

8    two but I gotta ask -- Jo Jo, gotta ask you what but Jackie,

9    I gotta ask what I wanna ask him.  He could answer some

10   questions that I need."

11        The government proffers that this is a

12   conversation in which Paradiso is instructing his associate,

13   Frank Romano, to get in touch with Frank Cali, who is close

14   with acting boss Jackie D'Amico, or with Jo Jo Corozzo, so

15   that Cali can arrange a meeting between Paradiso and one of

16   those two members.

17        This shows Cali's rank in the pecking order.  He

18   has -- a long-time Gambino captain, far his senior by

19   twenty-odd years, has to go through Cali to get in touch

20   with the administration, when the long-term captain wants to

21   talk to them.

22        A third example:  In early 2006, there was a

23   recording that shows Cali's sphere of influence.  A Gambino

24   associate is intercepted talking about a Florida soldier of

25   the Gambino family, who is located in Florida.  The tenor of

1  the discussion is how that soldier is protected by Frank

2  Cali, in New York, which puts some geographical dimension on

3  Frank Cali's reach.

4        A fourth example that the government proffers is,

5  in September of 2006, in which now indicted Gambino soldier

6  Joey Orlando was intercepted.  In that intercept, he's

7  complaining about Frank Cali.

8        And he says, "He's Jackie's guy", referring to

9  Jackie D'Amico, the acting boss.

10       Orlando says, "Jackie made him a skipper",

11 referring to his status as a captain.  And he says, "Some

12 snot-nosed, thirty-year-old kid", referring to the fact that

13 he's ascended through the ranks rather quickly at such a

14 young age.  And it's clear that Orlando doesn't like it but

15 no doubt about Cali's position.  There's no doubt about his

16 ties to the acting boss of the family.

17       In addition, Cali has ties to organized crime in

18 Italy.  Contrary to counsel's argument in his brief, the

19 government does not take issue with his ties to Italy.

20 Rather, the government takes issue with his ties to criminal

21 activity in Italy, specifically the Sicilian mob or La Cosa

22 Nostra.

23       In Cali's crew, he has many members and associates

24 who were born in Italy, and Cali is seen as a man of

25 influence and power by organized crime members in Italy.

1    One recording in particular establishes his reputation.  The

2    government proffers that in October of 2005, an interception

3    by a made member of the Italian mafia, who are called "Men

4    of Honor", is discussing with an associate in Palermo.  In

5    Italian, they're discussing Frank Cali.

6         The discussion in which of them says, "He's a

7    friend of ours", as it's translated in English.  "He is

8    everything over there", referring to Cali's reach in the

9    United States.

10        This is well beyond strong familial ties to Italy,

11   as counsel argues in his brief.  Not only is he known to

12   Italy, but he's a respected mafia leader, as is talked about

13   in Italy, in the United States.

14        Counsel claims that Cali is in a unique position,

15   in his brief, versus other codefendants who have not been

16   detained, and he is, and this evidence that I've proffered

17   shows it.  Cali's influence, power and stature as an

18   organized crime member separates him from those defendants

19   who have not been detained and for whom the government did

20   not seek detention.  It puts him head and shoulders above

21   those defendants.

22        The Second Circuit does not have a per se rule

23   about detaining organized crime members, and the government

24   does not argue for one.  But high ranking organized crime

25   members such as Cali, charged with crimes of violence such

1    as Cali, as part of a violent criminal enterprise such as

2    Cali, constitute a danger to the community.

3        Contrary to counsel's argument, several cases with

4    less violence support detention.  In the Gotti case, the

5    acting boss of the family, the Gambino family, was detained

6    on money laundering charges.  The court looked at the object

7    and means of the enterprise as a whole, including all the

8    charged predicates and defendants.  There, the purpose of

9    the enterprise was to commit extortion, and the defendant

10   did not even need to commit the acts of violence himself.

11       But the Second Circuit cases don't apply only to

12   bosses or acting bosses.  They also apply to organized crime

13   leaders like Cali, not just from their violence necessarily

14   but from directing subordinates who can and will commit

15   violence.  So far in this case, acting boss Jackie D'Amico

16   was detained on extortion charges.  Captain --

17       THE COURT:  Are these the same extortion charges

18   that Cali is charged with?

19       MR. LIPTON:  There is one in which -- I believe

20   there's one in which Jackie D'Amico was charged in -- no, I

21   take that back.  No, Jackie D'Amico was charged in a

22   different extortionate scheme than Frank Cali.

23       THE COURT:  Alright, and the Cali extortionate

24   scheme is --

25       MR. LIPTON:  Charges other individuals, including

1   the acting underboss of the family Dominick Cefalu.  That is

2   an extortionate scheme that involves, in particular, a

3   Nascar race track that was going to be built on Staten

4   Island.  I'll get to that in a moment, your Honor.

5           THE COURT:  Alright.

6           MR. LIPTON:  Because there are recordings that

7   relate to that.

8           THE COURT:  Okay.

9           MR. LIPTON:  Captain Leonard DiMaria, who was

10  charged in the same extortion as Mr. Cali, was detained on

11  extortion charges, and a third individual, a soldier,

12  Vincent Vassale (ph), was detained on extortion charges.

13          THE COURT:  Is Lenny DiMaria an acting captain?

14          MR. LIPTON:  He is an actual captain.

15          THE COURT:  Okay.

16          MR. LIPTON:  Granted, all of those individuals

17  have prior convictions while Cali does not, but that does

18  not mean Cali does not have a criminal past.  Rather, it

19  means that Cali has been a successful criminal up until now.

20          Three cooperating witnesses, who are former

21  members of the Gambino family, will testify that Cali has

22  been an active criminal dating back to the 1990's.  That's

23  set out in our detention memo, citing that he's involved and

24  had been involved in extortion, loan sharking, illegal

25  gambling and fraud.  Counsel is correct that he's not been

1    prosecuted for those crimes to date, but his ascendancy to

2    the position of acting captain in the family, and so

3    swiftly, belies any notion that he's led a crime-free life.

4          Cali, like other members of the family, have sworn

5    a blood oath to the organization to commit criminal

6    activity.  Cali has been successful in fulfilling that oath,

7    in large part because he's been careful.  As we will show,

8    there is ample evidence of this borne out by the recordings.

9    Indeed, even other captains weren't allowed to call Frank

10   Cali directly, and Cali did not call them directly.  As a

11   rule, they always went through associates.

12         Even when Cali -- even at that point, when

13   captains indicated they wanted to get in touch with Cali, he

14   wouldn't talk to them on the phone.  He would only meet with

15   them in person, avoiding any chance of being intercepted by

16   law enforcement.

17         For example, in October of 2005, the government

18   proffers, Cali's associate, Frank Inzerillo (ph), called an

19   associate of Mickey Paradiso, who I mentioned previously, an

20   individual by the name of Frank Romano, to arrange a meeting

21   between Cali and Paradiso.  Over a series of calls, the

22   associates set a meeting place.  They never mentioned Cali's

23   name, they never mentioned Paradiso's name.  Cali and

24   Paradiso then show up at the designated meeting place.

25         Just to give your Honor a flavor of what I'm

1    talking about, on October 9th of 2005, there's a call between

2    Inzerillo, Frank Inzerillo, and Romano, Frank Romano.

3    Inzerillo is the associate for Cali, Romano is the associate

4    for Paradiso.  Cali and Paradiso are both captains.

5          Inzerillo says, "Listen, he wants to know if he

6    can see your friend today, sometime like after 2:00, anytime

7    after 2:00."

8          "Romano:  The guy on Staten Island?" referring to

9    "Mickey Boy" Paradiso, where he lives.

10         "Inzerillo:  I don't know, I don't know.

11         "Romano:  You wanna call me back and let me know?

12         "Inzerillo:  Okay."

13         The government proffers that this conversation

14   relates to Inzerillo arranging a meeting for Cali.  At

15   approximately 12:21 that same day, about an hour later,

16   Inzerillo calls Romano.

17         "He said that's fine, the one in Staten Island is

18   fine", referring to Inzerillo getting word that Cali is okay

19   with meeting with Paradiso.

20         "Romano:  Alright, let me try to find and see

21   where they are.  I'll call you back, anytime after 2:00.

22         "Inzerillo:  Right.

23         "Romano:  Anytime okay?  I'll call you back."

24         This conversation relates to Inzerillo telling

25   Romano that Cali wants to meet with Paradiso.

1          Then about nine minutes later, at 12:22, Romano
2    called Paradiso and says, "Where are you?"  Paradiso says,
3    "Where are you?"
4          Romano says, "I'm home.  They wanna know if you're
5    gonna be around anytime after 2:00, the fruit guy, Frankie",
6    referring to Frank Cali.
7          "Paradiso:  Ah, the fruit guy?  Okay, I'm gonna be
8    there in about twenty minutes.
9          "Romano:  Where?
10         "Paradiso:  In Hunters", referring to a steak
11   house.
12         "Romano:  Okay, but after -- anytime after 2:00,
13   he says.
14         "Paradiso:  Anytime after 2:00.
15         "Romano:  Right."
16         At 12:40, which is twenty minutes later,
17   approximately, Romano called Inzerillo.
18         "Inzerillo:  Hey, Frank.
19         "Romano:  How are you?  Uh, is 2:00 by Hunter's --
20   outside Hunter's Steak House?
21         "Inzerillo:  Hunter's?
22         "Romano:  Yeah, across the street from Hunter's,
23   there's a park, Fourth Avenue.
24         "Inzerillo:  It's in Brooklyn?
25         "Romano:  Yeah.

1        "Inzerillo:  Okay.

2        "Romano:  On Fourth Avenue, okay?

3        "Inzerillo:  2:00.

4        "Romano:  2:00, he'll be there.

5        "Inzerillo:  Thank you, Frank."

6        This conversation relates to the meeting that's

7   now been set with Paradiso and Cali.  At approximately 2:00

8   p.m., which is about an hour and a half later, law

9   enforcement conducts surveillance and observed Paradiso meet

10  with Cali in the park across from Hunter's Steak and Ale

11  House.  And one of those law enforcement officials overhears

12  in part what appears to be Cali giving Paradiso travel

13  directions.

14        Two days later, on October 11th, 2005, at

15  approximately 4:34, Paradiso called Romano to say that the

16  had to take a ride "later", and they make arrangements for

17  Romano to drive Paradiso.

18        That evening, at about 6:21, Paradiso calls

19  Romano.  They have a conversation on the phone in which

20  Romano is told by Paradiso that he's running late and he's

21  going to drive himself.

22        At approximately 6:52, Paradiso calls Romano and

23  asks, "Where is this place?  Do you know?  On Van Brundt and

24  what?"

25        And Romano provides Paradiso with directions to a

1   building right before Red Hook Terminal, in Brooklyn.  At

2   approximately 7:00 or 7:06 p.m., law enforcement conducts

3   surveillance and they observe Paradiso's car on Hamilton

4   Avenue, by Red Hook Terminal.  At approximately 10:30, which

5   is about two and half -- three and a half hours later, law

6   enforcement observe Paradiso exit Cali's car and get into

7   his own car and leave.

8         Law enforcement then follow Cali to a location in

9   Manhattan, at approximately 11:00, and they see him enter

10  the restaurant.  At approximately 11:24, they observe Cali

11  in the restaurant with Jackie D'Amico and Dominick Cefalu

12  and Dominick Cefalu's son, who is a soldier in the family.

13        At approximately 12:02, they observe those four

14  individuals leave the restaurant and engage in conversation

15  on the street for about an hour and a half before Cali,

16  D'Amino and the older Cefalu, the acting underboss, depart

17  in Cali's car.

18        The government proffers that the meeting in the

19  park across from Hunter's two days before the restaurant

20  meeting is when Cali gave Paradiso travel directions in the

21  vicinity of Red Hook Terminal, where Cali met with and later

22  dropped off Paradiso before proceeding to Manhattan, where

23  he met with Cali -- excuse me, with Cefalu and D'Amico.

24        Not only does this show the lengths with which

25  Cali goes to avoid detention just to set up a meeting with

1   members of organized crime -- oh, and by the way, all the
2   while, although it's not clear whether or not Cali knows
3   this, Paradiso is on state parole -- it also shows the
4   relationship and access that Cali has to the people running
5   the family.
6          The government has already proved in the detention
7   hearing for D'Amico that he is the acting boss, and
8   cooperating witness testimony and recordings will show that
9   Cefalu is the acting underboss.
10         In addition to those surveillances, and there are
11  others besides that one, in which Cali is meeting with
12  Romano and Paradiso, there is also surveillance of Cali
13  meeting, in 2007, with Dominick Cefalu, the acting
14  underboss.  Law enforcement observed Cali with Cefalu on at
15  least three occasions, in June and September, in Brooklyn.
16         But Cali's conduct is not limited to just meeting
17  with administration members; it also involves the charged
18  extortion and extortion conspiracy.  Specifically, it was an
19  extortion of a company owner in the construction industry,
20  in which the Gambino members, including Cali, were profiting
21  from a company that couldn't gain employment or access into
22  the industry without the Gambino family stamp of approval.
23         The price of admission was a chunk of the profits
24  off the top.  And who made sure that it was enforced?  It
25  was the Gambino soldiers and associates.  At whose

1  direction?  It's the Gambino higher-ups, including Cali.

2  And who ends up profiting from that illegal conduct?  In

3  this case, it's everyone, if the extortionate pressure and

4  control is successfully applied, as it was here.

5       So that construction owners like John Does #4 in

6  the counts in which Cali is charged know the price of non-

7  compliance, and they decide to play ball.  So rather than

8  risk injury to person or property, they risk the loss of

9  profits.  And as upper management, that's what Cali is

10  overseeing in this extortion.

11       Counsel argues that the government does not allege

12  any violence or direct threats, but the law does not require

13  those sort of acts.  And why?  The law does not want to

14  reward good extortioners, those who successfully instill

15  fear without having to resort to the ultimate act of

16  violence.  Indeed, Gotti makes clear that no crimes of

17  violence have to be alleged at all of the particular

18  defendant.

19       The same argument was made and rejected in

20  D'Amico's detention hearing, who was detained without any

21  acts of direct threats of violence.  The same argument was

22  made and rejected for DiMaria, who was also detained without

23  acts or direct threats or violence.  The same goes for Cali

24  here.  Like those defendants, Cali has adopted the goal of

25  the enterprise, the Gambino family.  And in his position,

1   he's able to plan the acts of violence and to order and

2   supervise other members to carry them out when necessary.

3          The defendant contests the weight of the evidence

4   by arguing that Cali is not actually intercepted on the

5   recordings, and that's not surprising, given his position.

6   Like D'Amico, Cali does not have to meet face to face with

7   the victims; he's directing the activity from above.

8          And the evidence shows that Cali did not have to

9   get his hands dirty.  He is discussed on the recordings in

10  an extortion scheme, by name, not as counsel suggests,

11  vaguely, but by name, time and time again, specifically by

12  Gambino soldier Ernest Grillo, who is the one actively

13  running the extortion with regard to John Doe #4.  And it's

14  not once, but it's multiple times.

15         It's all showing, as the government proffers, how

16  Grillo won't make a move until the extortionate scheme is

17  cleared through the higher-ups, and one of those higher-ups

18  in this case and this extortion scheme is Frank Cali.

19         In conclusion, your Honor, the activities of the

20  Gambino family did not cease with the arrest of its

21  principals like Cali.  The extortion that he's involved in

22  and other legal schemes have been rooted and in place for

23  several years, and they require the attention of Gambino

24  members like Cali to oversee them or they will fail.  Under

25  these circumstances, there is strong incentive on the part

```
 1   of Cali and other leaders of the family to continue business

 2   as usual.  And when the business as usual involves threats

 3   and threats of violence, the danger to the community is

 4   evident.

 5            The government also moves on the grounds of risk

 6   of flight.  The government has described in this detention

 7   memo the ties that Cali has to Italy, and we've laid them

 8   out --

 9            THE COURT:  I'm not persuaded there's a risk of

10   flight.

11            MR. LIPTON:  Alright, your Honor.  If there's

12   any --

13            THE COURT:  Are any of the other acting captains

14   out on bail?

15            MR. LIPTON:  No, your Honor.

16            THE COURT:  Are there any other acting captains

17   indicted?

18            MR. LIPTON:  Yes, there are several other captains

19   who are indicted, one of which is a fugitive, one of which

20   -- two of which have prior cases.

21            THE COURT:  Have what cases?

22            MR. LIPTON:  Prior cases.  One is incarcerated and

23   was writted in, another was recently sent to a halfway house

24   and he was arrested at the halfway house because the writ,

25   for whatever --
```

```
 1              THE COURT:  But he obviously had a prior
 2   conviction.
 3              MR. LIPTON:  He has a prior conviction, correct.
 4              THE COURT:  So he's the only acting captain
 5   without a prior conviction?
 6              MR. LIPTON:  I believe he might be the only acting
 7   captain without a prior conviction; that is correct, your
 8   Honor.  He's also the only acting captain with the ties to
 9   the administration and to Italy; we don't have evidence of
10   anybody else in that regard.
11              MR. PROTASS:  Thank you, your Honor.  The
12   government here is painting speculative strokes that are
13   entirely too broad.  The fact is that in the Second Circuit,
14   Mr. Cali is entitled to an individualized determination of
15   bail, based on the factors set forth in the Bail Reform Act.
16   And this is so, notwithstanding the allegations that the
17   government makes of Mr. Cali's involvement with organized
18   crime and notwithstanding all of the tapes that the
19   government has read.
20              I think it's important to note from the outset
21   that Mr. Cali, as your Honor has recognized, has never been
22   arrested, never been charged with a crime, never been
23   convicted of an offense.  Even the government admits that.
24   Second, Mr. Cali is charged in only two of the eighty counts
25   in the indictment here, Count 38 and 39.  In fact, his name
```

1    appears in only two of the 169 pages in the indictment.

2         The government made a point of saying that other

3    alleged members of the administration, whatever that may be,

4    Jackie D'Amico and Leonard DiMaria, were detained, but it's

5    worth pointing out that Mr. Cali -- that those individuals

6    were charged in the racketeering conspiracy, Mr. Cali is

7    not.

8         And as a footnote, as I pointed out in my papers,

9    your Honor, all of the cases that the government cites in

10   support of the proposition that people who are alleged to

11   have the alleged role that Mr. Cali has, that there is

12   almost a presumption of detention, which is essentially what

13   the government is arguing for, are inapposite, because they

14   all involve crimes that are much more serious than the

15   crimes with which Mr. Cali has been charged.

16        I'd like to go through the Bail Reform Act factors

17   with your Honor.  First, I'm going to skip, as you've just

18   said, that Mr. Cali presents no flight risk.  Obviously, we

19   agree based on his --

20        THE COURT:  Let me just interrupt you and ask Mr.

21   Lipton something.

22        MR. PROTASS:  Sure.

23        THE COURT:  Mr. Lipton, is it your position that

24   if he was released on a bond that required him to be on

25   total house arrest with a wiretap on his phone and a strict

1  list of who he could see and who he couldn't see, that you

2  still would maintain that he's a danger to the community?

3          MR. LIPTON:  Yes, Judge.

4          THE COURT:  Why?

5          MR. LIPTON:  For two reasons: One, the Second

6  Circuit has said that members in leadership positions such

7  as Mr. Cali's who have been charged with crimes of violence

8  and who have the factual sort of basis for being able to

9  direct underlings to commit crimes of violence when

10 necessary, they've said that there's really no elaborate

11 package, including home detention, including electronic

12 monitoring, even guards outside the house, tapping telephone

13 calls and the like, are sufficient when somebody is a danger

14 to the community.

15         THE COURT:  But clearly, bail packages like that

16 have been set, and the Circuit has not overturned them.  So,

17 yes, while the Circuit has said that, it has been a

18 situation that has been put in place by various judges, and

19 it hasn't resulted in any criminal activity.

20         MR. LIPTON:  I don't know if it hasn't resulted,

21 but I know that in the sort of --

22         THE COURT:  Tell my why that wouldn't be

23 sufficient in the case of Mr. Cali.

24         MR. LIPTON:  Well, there are a couple of reasons.

25 The first thing is that one of the bail -- the bail package,

1   from my understanding, includes two properties, one of which

2   is a house owned by Frank Inzerillo, the same Frank

3   Inzerillo that I discussed, who is an associate of --

4            THE COURT:  Is Frank Inzerillo out on bail?

5            MR. LIPTON:  Frank Inzerillo is not charged in

6   this case.

7            THE COURT:  Oh, alright.

8            MR. LIPTON:  But he is an associate of Frank Cali

9   and he's the one that was the conduit, setting up all the

10   calls when we had wiretaps on Frank Romano's phone, in which

11   he's setting up all these meetings.  He's the one that

12   everyone as to contact.  Law enforcement sources in Italy

13   say that Frank Inzerillo's father is a "Man of Honor", a

14   made member of the Italian mafia.

15            MR. PROTASS:  Your Honor, if I could just

16   interrupt here.  One of the properties that we're offering

17   up is not -- we're not offering any property that's owned by

18   Frank Inzerillo.

19            THE COURT:  Okay, moving on then.

20            MR. LIPTON:  I'm sorry, I was misinformed then

21   because it was --

22            THE COURT:  That's alright.

23            MR. LIPTON:  The property that Frank Cali owns

24   apparently is only in his wife's name.  From my

25   understanding, his wife is -- does not work, does not have

```
1    any stream of income, takes care of the three children that

2    I think are under five years old.  The first property that

3    they were living in before the new house was renovated,

4    there was an $800,000 mortgage, in which the application has

5    zero assets listed and no income from Frank Cali's wife, who

6    is on that property.

7              THE COURT:  They got a mortgage?

8              MR. LIPTON:  What?

9              THE COURT:  They've got a mortgage?

10             MR. LIPTON:  They've got an $800,000 mortgage on

11   that property through the wife's name, without any assets

12   put down whatsoever.  This other property is in Frank Cali's

13   wife's name, who is at home taking care of three children

14   with, from what I understand, no source of income.  So the

15   houses that are being put up, your Honor, obviously need to

16   be scrutinized very carefully, because it doesn't appear --

17             THE COURT:  So you're suggesting they were funded

18   with criminal proceeds.

19             MR. LIPTON:  Yes, absolutely, your Honor.

20             MR. PROTASS:  Your Honor, I think that we can

21   establish that they are not in fact funded with criminal

22   proceeds, and I'm happy to go through the provenance of the

23   house that's owned by his wife to demonstrate that, if you'd

24   like me to.

25             THE COURT:  Yeah, I would.
```

1          MR. PROTASS:  Okay.  The house was purchased --

2     the house in which Mr. Cali's lived immediately preceding

3     the house which she owns today was located on Toad Hill

4     Road, in Staten Island.  It was bought in 1997, for

5     $335,000, approximately.  That house was purchased by Mr.

6     Cali's wife before they were married.  The funds used to

7     purchase that house were the result of a settlement from a

8     lawsuit with the City of New York, I believe it is.

9          I don't know if it actually resulted in her

10    father's death, but her father died and the proceeds of this

11    lawsuit were in part given to Mr. Cali's wife, who purchased

12    this house for $335,000.  It was subsequently sold, this

13    year, for 1.7 to 1.9 million dollars.  There was a

14    substantial -- from 1997 to 2008, a substantial increase in

15    the real estate market, and the proceeds from that house

16    sale were then poured into the purchase of the house --

17          THE COURT:  And you are able to document that.

18          MR. PROTASS:  I will be able to document that.

19          THE COURT:  You know, let me just cut this short.

20    I am not persuaded that there are no conditions under which

21    he can be released, but I have concerns about these

22    properties.  I would consider -- I will hear you, but I want

23    you first to be able to show the government -- walk them

24    through the documentation regarding these houses, because if

25    it's not squeaky clean, I'm not considering it.

1          MR. PROTASS:  Okay, your Honor.

2          THE COURT:  So perhaps we should just put this

3     over.

4          MR. LIPTON:  Your Honor, I would ask that, in the

5     same vein, if we can get tax returns for Mr. Cali and his

6     wife.

7          THE COURT:  Yeah.

8          MR. LIPTON:  And also for their business that

9     they're saying is maybe one of the properties they're

10    putting up.

11         THE COURT:  Oh, I didn't understand a business

12    property was being put up.

13         MR. PROTASS:  No.  We have three properties that

14    we are able to put up, your Honor.

15         THE COURT:  It's in the end of your memo, right?

16         MR. PROTASS:  Right, but there's been a slight

17    change since the memo.

18         THE COURT:  Okay, then tell me.  Let's all be

19    clear about what properties before we --

20         MR. PROTASS:  Sure.  The two properties that I

21    think are referenced in my memo, as I recall, is his wife's

22    home on Hill Top Terrace, in Staten Island --

23         THE COURT:  Wait a minute.  Alright, which one?

24         MR. PROTASS:  His wife's home, the one we were

25    just --

```
 1              THE COURT:  Wait, the family residence?
 2              MR. PROTASS:  Well, yes, the family residence.
 3              THE COURT:  That's being renovated?
 4              MR. PROTASS:  That's being renovated, correct.
 5              THE COURT:  Okay.
 6              MR. PROTASS:  His brother-in-law --
 7              THE COURT:  What's the address of that?
 8              MR. PROTASS:  25 Hill Top Terrace.
 9              THE COURT:  Okay.
10              MR. PROTASS:  Staten Island, New York.
11              THE COURT:  And who's on the deed there?
12              MR. PROTASS:  His wife is on the deed.
13              THE COURT:  Second?
14              MR. PROTASS:  Second is his brother-in-law's home.
15              THE COURT:  Where is that?
16              MR. PROTASS:  That is 110 Norwalk Avenue, Staten
17    Island.
18              MR. LIPTON:  Can I ask who his brother-in-law is?
19              THE COURT:  Who is his brother-in-law?
20              MR. PROTASS:  Daniel Inzerillo.
21              THE COURT:  Alright.
22              MR. LIPTON:  Is he the only one on the deed?
23              MR. PROTASS:  It's my understanding he's the only
24    one on the deed.
25              THE COURT:  Do you have appraisals for these
```

1   properties?

2          MR. PROTASS:  I have some appraisals for these

3   properties.

4          THE COURT:  Alright, go on, what's the third one?

5          MR. PROTASS:  The third is Mr. Cali's sister-in-

6   law and brother-in-law's property, at 1266 82nd Street, in

7   Brooklyn.

8          THE COURT:  Who are they?  What are their names?

9          MR. PROTASS:  Antoinette and Joe Parelli.

10         THE COURT:  Do you have an appraisal for that?

11         MR. PROTASS:  Yes, I do, your Honor.

12         MR. LIPTON:  Can you spell that?

13         MR. PROTASS:  P-a-r-e-l-l-i, I believe.

14         THE COURT:  The 25 Hilltop is the one you -- one

15  of the ones you have an issue with, right, Mr. Lipton?

16         MR. LIPTON:  Well, Judge, yeah.  It's in his

17  wife's name and I would like to see --

18         THE COURT:  Right.  This is where there's an

19  $800,000 mortgage?

20         MR. LIPTON:  I thought that was on the previous

21  property but I could be wrong.  That may have been on the --

22         THE COURT:  Here's what we're going to do.  I'd

23  like the government to inquire -- I would like the

24  government to be satisfied with regard to the properties.

25  I'm not saying that I'm going to release him on this, but I

```
 1   think there are just too many questions raised for which you

 2   need to provide documentation.  So I'm going to put this

 3   over to -- do you want to do this on Thursday?  When do you

 4   think you'll be able to provide all the information?

 5          MR. PROTASS:  Can I consult with the family for

 6   just a moment?

 7          THE COURT:  Yeah.

 8          (Pause in Proceedings)

 9          MR. PROTASS:  Your Honor, out of an abundance of

10   caution, I would like to go with next Tuesday.

11          THE COURT:  Next Tuesday.

12          MR. PROTASS:  To make sure that we have

13   everything.

14          THE COURT:  Okay, next Tuesday at -- what time is

15   that, Sui-May?

16          THE CLERK:  (Ui).

17          THE COURT:  What day is that?

18          MR. PROTASS:  There's a conference with Judge

19   Garaufis on the 27th at 11:00.  We could do it that same day.

20          THE COURT:  That's fine, the 27th is fine.  I don't

21   know what my calendar is that day but --

22          THE CLERK:  What time is the status?

23          MR. PROTASS:  The status is at 11:00.

24          MR. LIPTON:  If your Honor has something earlier

25   in the day --
```

1          THE COURT:  What day of the week is that?

2          THE CLERK:  Are you taking it?

3          THE COURT:  Well, since they've already gone

4    through this, they might as well stay with me.

5          THE CLERK:  Okay, I'm sorry.

6          THE COURT:  What day of the week is that?

7          THE CLERK:  That's a Wednesday.  The 27th, right?

8          MR. PROTASS:  Yes.

9          THE CLERK:  That's a Wednesday.

10          THE COURT:  Just come after your conference with

11    Judge Garaufis.  Just come to my courtroom.

12          MR. PROTASS:  Yes, Judge.

13          THE COURT:  Thank you.

14          MR. LIPTON:  Just to be clear on what we're

15    asking, can we have tax returns?

16          THE COURT:  Yeah, I want any documentation that

17    you want to sufficiently vet these properties, because I

18    don't want any questions left unanswered when I hear you

19    again on this.

20          MR. LIPTON:  Just to be clear, Judge, I'm going to

21    ask for tax returns for Mr. Cali, his wife --

22          THE COURT:  Yeah.

23          MR. LIPTON:  And also, the corporate returns for

24    the business that Mr. Cali says he has these employees

25    working for him.

1          THE COURT:  Well, to the extent that they are
2    helping fund the properties.
3          MR. PROTASS:  They're not being offered up for the
4    property, so he has no reason to produce those.
5          MR. LIPTON:  It's just that's part of their
6    argument.
7          THE COURT:  But isn't that how they could then pay
8    for the properties?
9          MR. PROTASS:  I'm lost, your Honor.
10         THE COURT:  Alright.
11         MR. PROTASS:  The properties that are being
12   offered up are properties owned by his wife and by him.
13         THE COURT:  You want the business tax returns
14   because?
15         MR. LIPTON:  For two reasons:  To see where the
16   funds are, if they're using any money to pay for the house.
17         THE COURT:  That's what I thought.
18         MR. LIPTON:  Also, because they're saying that Mr.
19   Cali needs to --
20         THE COURT:  Be at the business.
21         MR. LIPTON:  -- be at the job, right, so I want to
22   make sure that there is a thriving business that --
23         THE COURT:  Turn them over.  Thank you.
24         MR. LIPTON:  Can we have them for the last three
25   years?

1          THE COURT:  Three years.  Thank you.

2          MR. LIPTON:  Thank you, Judge.

3          * * * * * * * * * * * * * *

        I certify that the foregoing is a correct transcript
from the electronic sound recording of the proceedings in
the above-entitled matter.



ELIZABETH BARRON                    February 21, 2008