# Exhibit One

SUPREME COURT : STATE OF NEW YORK
APPELLATE DIVISION : SECOND JUDICIAL DEPARTMENT
------------------------------------------------------------X

In the Matter

- of -

The Interception and Recording of Certain Telephonic and
Electronic Communications Occurring Over the Cellular
Telephone and Instrument Currently Assigned Mobile Identification
Number (201) 538-1866, Listed to Nesco Inc., 211 W. 5th Street,
Bayonne, New Jersey.

**AFFIDAVIT**

------------------------------------------------------------

STATE OF NEW YORK     )
                      ) ss.:
COUNTY OF WESTCHESTER )

JONATHAN MELLONE, being duly sworn, deposes:

1. I am a Special Agent of the United States Department of Labor, Office of Inspector General, Office of Labor Racketeering and Fraud Investigations ("DOL/OIG"), and have held that position for approximately three and one half years. I am also designated as a Special Investigator for the New York State Organized Crime Task Force ("OCTF"). I am a graduate of a Criminal Investigator Training Program taught at the Federal Law Enforcement Training Center, Glynco, GA. My current responsibilities include, among other things, conducting complex investigations involving Organized Crime, specifically the five families of La Cosa Nostra ("LCN") in the New York Metropolitan area and their infiltration and control of unions, contractors' associations, and companies involved in the construction industry in New York City, and Long Island. I have worked closely with agents of the Federal Bureau of Investigation ("FBI"), the Internal Revenue Service ("IRS"), the United States Department of

Transportation ("DOT"), the New York City Trade Waste Commission, and the United States Postal Inspection Service, who are experienced in matters of corruption within the New York construction industry.

2. A joint investigation being conducted by OCTF, DOL/OIG, the FBI, the New York City Department of Investigation ("DOI"), the IRS, the City of New York Business Integrity Commission ("BIC"), and the Waterfront Commission of New York Harbor (WCNYH) into illegal conduct in the New York City construction trucking and hauling industry, has revealed probable cause to believe, among other things, that Nicholas "Nick" Calvo, Michael "Mike" King, Anthony Delvecchio, their agents, co-conspirators and others yet unknown are engaged in, and continue to engage in designated crimes, namely, Commercial Bribing in the First Degree (Penal Law Section 180.03), Commercial Bribe Receiving in the First Degree (Penal Law Section 180.08), Falsifying Business Records in the First Degree (Penal Law Section 175.10), Grand Larceny in the Third Degree (Penal Law Section 155.35), as well as Conspiracy (Penal Law Article 105) to commit these crimes in violation of the Penal Law of the State of New York. Further, there is probable cause to believe that these individuals, their agents, co-conspirators, and others as yet unknown, have used, are using and will continue to use the cellular telephone and instrument currently assigned mobile identification number (201) 538-1866, listed to Nesco Inc., 211 W. 5th Street, Bayonne, New Jersey, per Nextel records ("the Calvo cell phone") in furtherance of these designated offenses.

3. Consequently, I submit this affidavit in support of the Application of J. Christopher Prather, Deputy Attorney General-In-Charge of the New York State Organized Crime Task Force, for an Eavesdropping Warrant authorizing the interception and recording of

2

certain telephonic and electronic communications occurring over the Calvo cell phone.

4.  Unless otherwise indicated, the facts set forth in this affidavit are based upon my own observations and knowledge, my examination of the investigative reports prepared by investigators involved in this investigation, my personal conversations with members of OCTF, the USDOL, DOI, IRS, BIC, WCNYH and the FBI, my conversations with a confidential informant ("the CI"), my review of telephone billing records, pen register data and conversations intercepted pursuant to court authorized electronic surveillance, and my review of the information gathered from the investigation being conducted by those agencies listed above. All information attributed herein to the FBI has been obtained by me through conversations I have had with Special Agent Vincent O'Hara or from FBI reports I have obtained from him. In addition, I have consulted with Special Agent-In-Charge John McGlynn of the DOL/OIG, and Supervising Investigator ("SI") George Pagnotta of the Organized Crime Task Force.

5.  SI Pagnotta has served as an investigator with the Attorney General's office since 1985 and has been assigned to the Organized Crime Task Force since 1996. He has reviewed this affidavit and agrees with all of the opinions and conclusions contained herein. SI Pagnotta has supervised and conducted numerous criminal investigations, resulting in the arrests of hundreds of individuals. He has conducted several Mafia-related investigations targeting the construction trade unions and corrupt labor union officials. He has listened to thousands of conversations intercepted pursuant to court-authorized wiretaps discussing Mafia and labor racketeering matters. He has provided expertise about Mafia controlled unions to other agency investigators and prosecutors. Through his experience of conducting Mafia-related investigations, he has become familiar with the hierarchy of the five Organized Crime families

3

based in the New York City area, the identity of many of the current members of the five families and the roles these members play within the hierarchies. He is also familiar with the Mafia's organizational structure, language, customs and traditions. Prior to his employment with OCTF, SI Pagnotta served as a police officer and a detective with the New York City Police Department for more than eighteen years. From his experience and training, he has become familiar with the language, activities, conduct and customs of Mafia members and individuals engaged in labor racketeering and illegal activity relating to the New York City metropolitan area construction industry.

      6.    Since 1997, John McGlynn has been the Special Agent-In-Charge for the United States Department of Labor, Office of the Inspector General, Office of Labor Racketeering and Fraud Investigations, DOL/OIG. He has also been designated as a Special Investigator, police officer, for the OCTF. As the manager of the New York Regional Office, which includes field offices with jurisdiction throughout the Northeast United States, including the States of New York, New Jersey, Connecticut, Massachusetts, New Hampshire, Vermont and Maine, he is responsible for independently planning, directing, overseeing and coordinating the conduct of criminal investigations of individuals, groups and entities suspected of violations of the federal labor laws. Many of these investigations involve labor racketeering and organized criminal activity of "La Cosa Nostra" i.e., the Mafia, as well as other non-traditional organized crime groups. Prior to becoming the Regional Inspector General, he was the Assistant Special Agent-In-Charge of the DOL/OIG for six years. Before that, he was a Special Agent for the New York Office for eight years. During the course of his career with the DOL/OIG, as both a Special Agent and an administrator, he has supervised and conducted numerous criminal investigations,

4

resulting in the arrests of hundreds of individuals. He has conducted several Mafia-related investigations targeting the construction trade unions and corrupt labor union officials, five of which resulted in the convictions of members of the Genovese, Lucchese, and Gambino Crime Families for labor violations of the United States Code, Titles 18 & 29. He has listened to thousands of conversations intercepted pursuant to court-authorized wiretaps discussing Mafia and labor racketeering matters. He has provided information about Mafia controlled unions to law enforcement agencies, prosecutors and judges. He has acted in an undercover capacity on numerous occasions, posing as a business owner meeting with corrupt union officials, where he discussed the means and methods of their illegal activities, in particular, kickback payments, money embezzled from union benefit funds and other illegal payoffs. Prior to his employment with DOL/OIG, he served as a police officer and a detective with the NYPD for more than twenty-one years. From all these sources, he has become familiar with the language, activities, conduct, customs and methods of individuals engaged in labor racketeering and other illegal activities relating to the New York City's construction industry.

7.  All dates and times referred to herein are approximate. Furthermore, unless otherwise noted, where statements of other individuals are described, those descriptions are intended to convey the sum and substance of such statements, and are not necessarily exact quotes. This affidavit is submitted for the sole purpose of supporting an application to conduct electronic surveillance. Consequently, not every detail or aspect of our ongoing investigation has been noted herein.

**Overview of the Investigation**

8.  During the fall of 2004, OCTF and the agencies listed above began a joint

5

investigation of construction-related crimes occurring in Richmond, Kings, Bronx, New York, and Nassau Counties and elsewhere based on information received from the court-appointed monitor of Local 282 of the International Brotherhood of Teamsters.

9. Based on, among other means, pen register and trap and trace data, phone company records, my conversations with other investigators assigned to this case, consensual recordings made by a confidential informant ("the CI"), and surveillance and law enforcement reports known to me, there is probable cause to believe that Nicholas "Nicky" Calvo, Michael "Mike" King, Anthony Delvecchio, their agents, co-conspirators and others yet unknown, are committing the crimes of Commercial Bribing in the First Degree (Penal Law Section 180.03), Commercial Bribe Receiving in the First Degree (Penal Law Section 180.08), Falsifying Business Records in the First Degree, Grand Larceny, as well as Conspiracy to commit these crimes in violation of Section 175.10 and Articles 155 and 105 of the Penal Law of the State of New York, and are communicating and consorting with members and associates of the Genovese crime family, in furtherance of those crimes.

Summary of the Illegal Schemes

10. In sum, Nicholas Calvo, Michael King, Anthony Delvecchio, and others, have agreed with the CI to engage in a multi-faceted bribery-based scheme. I have spoken directly with and debriefed the CI about the scheme and its execution (which is ongoing) and I have listened to consensual recordings made by the CI over the last few weeks which also reveal and confirm the details of the scheme. Pursuant to the scheme, the CI, who is a dump truck contractor in New York City, has paid $6,000 over approximately the last month to Calvo (an employee of a New Jersey-based dump truck company, Nacerima Industries) Anthony

6

Delvecchio and Mike King, employees of Schiavone Construction Company ("Schiavone," a large, heavy construction company based in Secaucus, New Jersey, which is undertaking a number of current contracts in New York City, including for the NYC Department of Environmental Protection). In exchange, among other things, King has agreed to exercise influence within Schiavone to obtain dump truck work for the CI. The CI is performing dump truck work as a result of the scheme at a Schiavone job located in Manhattan in the vicinity of 30th Street and 10th Avenue where Schiavone is working for the New York City Department of Environmental Protection ("DEP").[1] As an additional part of the scheme, the CI has also obtained an agreement with Calvo and King to receive work at another Schiavone job being done for the DEP, at the Croton Water Treatment Plant Project in the Bronx ("the Croton Project"). The CI has met with Calvo and King in this regard, and has also met with various executives and managers from Schiavone about the Croton Project and the 30th Street job.[2] Certain of the executives have instructed the CI that the CI is to perform the work at the Croton Project under the guise of a company portraying itself as a legitimate women's business enterprise ("WBE"). The DEP contract requires that a WBE receive five percent of this work on the job. In fact, the executives understand that the CI's company will be doing the work. Based on the CI's

---

[1] Delvecchio is the Project Manager for Schiavone at the New York City water tunnel job at 30th Street and Tenth Avenue on the west side of Manhattan, and King is a foreman for Schiavone at the same job. The CI was told by Calvo that King will use his position as foreman to influence Schiavone management to use the CI's company. Calvo also has an ongoing relationship with King which involves Calvo paying a kickback to King to get waste metal removal work from Schiavone on its jobs, the CI said.

[2] The CI has presented me with Schiavone business cards and paperwork relating to the Croton Project. The business cards bear the following names: Nelson R. Sanchez, Jr., Project Engineer, Steven Molon, Chief Estimator, Reggie Elsman, Vice President of Operations, Bryan Diffley, Project Manager, Carl Cosenzo, Executive Vice President, Frederick W. Bunker, Vice President.

7

agreement with the woman, the CI will end up with 93% of the contract payments from Schiavone for this work, less a 7% fee that the woman, Marina Poetsma, is charging the CI for the use of her company's name in the undertaking.

The Background of the Investigation

11. During December of 2004, I was informed by Robert Machado, the court-appointed corruption investigator for Local 282 of the International Brotherhood of Teamsters, that a trucking contractor had offered bribes to two of the Union's business agents. The substance of what Machado told me was placed in a report which I have read. Machado, a former Lieutenant with the New York City Police Department, reported that on October 27, 2004, Thomas Gesualdi, a Local 282 business agent [a fiduciary and officer of the union responsible for, among other things, enforcing the terms of collective bargaining agreements and protecting the interests of union members], met with Nicholas Calvo, a representative of Nacirema Industries, a dump and demolition waste trucking firm headquartered in Bayonne, New Jersey, which intends to employ or employs members of Local 282. Gesualdi reported the meeting to Machado. The meeting took place on Staten Island and was also attended by a person believed by Gesualdi to be the comptroller of the company, and an unknown person who was perceived as "muscle." That person was later identified on November 3, 2004, by Calvo to Gesualdi as "Frank" [Frank Giovinco] who was mentioned in the book Takedown.[3] Among

---

[3] Takedown, written by Rick Cowan and Douglas Century, was first published by G.P. Putnam & Sons in 2002. The book discusses the multi-year investigation and prosecution in 1997 of members and associates of the Genovese and Gambino crime families who used extortion to control the commercial carting industry in New York City. Frank Giovinco was a defendant in the case and was regarded by the New York County prosecutors as a soldier in the Genovese family. According to NYSID records, in 1997 Giovinco pleaded guilty to one count of Attempted Enterprise Corruption, a C felony, and was sentenced to 3 to 9 years in state prison. According to NYSID records, he was discharged from

other things, the participants discussed a debt of $20,000 owed by Nacirema to the Local 282 fringe benefit funds. However, Calvo also told Gesualdi that he had gotten work for another trucking company at a New York City water tunnel project through his influence over Schiavone Construction Company. Calvo said that Schiavone was with the same "crew" [Mafia crew] in "the village" [Greenwich Village] as he is, and that they were going to take the work away from the trucking company because a representative of that company had "disrespected them."

12. On November 3, 2004, Gesualdi met with Calvo at the Greek Diner on New Dorp Lane on Staten Island. Gesualdi was joined by a fellow business agent from Local 282, Larry Kudla. Both reported the meeting to Machado. According to Machado's report, among other statements made by Calvo was an admission that he had served time in prison, and that he at one time lived on Sullivan Street in Greenwich Village. He also said that he had been in the restaurant business with a man named Esposito, whom he said was the son of someone he identified by touching his chin [a reference to Vincent "the Chin" Gigante, the currently-incarcerated boss of the Genovese crime family who was affiliated with the Greenwich Village crew].[4]

13. Calvo told Gesualdi and Kudla that he "is taking over the carting from 'New Jersey,' that 'Cardella' is out." He said that Nacirema has available "2000 mini-boxes" [a type of carting receptacle transported on a truck] which he plans to bring into New York City to engage in the carting business. He said that he had a collective bargaining agreement with

---

parole on August 29, 2003.

[4] According to New Jersey public records, Calvo was involved with a restaurant known as "Mezzaluna" in Weehawken, New Jersey, in the 1990s.

9

Teamsters Local 945 in New Jersey. He said that the New York Teamsters Local 813 [which has jurisdiction over carting trucks] had nothing to say about him coming into New York because he was "cleared by Hoffa." When Larry Kudla left the table to put more money into a parking meter, Calvo offered Gesualdi $1.00 for every yard of carting work he could develop for Calvo if Gesualdi chose to do so. After Kudla returned to the table and Gesualdi left the table, Calvo made the same offer to Kudla.

14. Calvo also told Gesualdi and Kudla that he will be getting work from Schiavone Construction and that he has a large number of "Local 282 trucks lined up to do work for Schiavone." As an employer or prospective employer of members of Local 282, Calvo's offer of money to Gesualdi and Kudla may reasonably be suspected as an attempt to improperly influence their conduct in dealing with him on issues relating to Local 282 [such as debt owed to the Union fringe benefit funds, as discussed above, or enforcement of the collective bargaining agreement].

15. Records of the New York Department of State indicate that the business address of Nacerima Industries Incorporated is 211 W. 5th Street, Bayonne, New Jersey (the same address as "Nesco, Inc.," the subscriber to the Calvo cell phone), and that it is an active New Jersey corporation.

16. The subjects of the criminal investigation are Nicholas "Nick" Calvo, Gino Cracolici, Michael "Mike" King, Michael Schlaefer, Anthony Delvecchio, Nelson Sanchez, Marina Poetsma, their agents, co-conspirators and others yet unknown.

Pen Register and Trap and Trace Orders

17. On December 7, 2004, the Honorable Barry A. Cozier, Associate Justice

10

of the Appellate Division, Second Judicial Department, issued an Order authorizing the installation and use of a pen register and trap and trace device on the Calvo cell phone relating to the conduct described <u>supra</u> in paragraphs 11 through 14. That order expired on February 7, 2005.

    18.    On March 8, 2005, the Honorable Gabriel Krausman, Associate Justice o the Appellate Division, Second Judicial Department, issued an Order authorizing the installation and use of a pen register and trap and trace device on the Calvo cell phone and on a cellular telephone and instrument assigned MIN (914) 755-2631, listed, according to Nextel, to Gino Cracolici, 220 Summit Drive, New Windsor, New York, ("the Cracolici cell phone") relating to the conduct described <u>infra</u>.

<u>Recent Developments</u>

    19.    A confidential informant ("the CI") is actively assisting the present investigation. The CI has worked, and continues to work, in the New York City construction industry as an owner of a trucking company headquartered in Staten Island that provides dirt and demolition waste removal services for major construction and demolition projects.[5]

---

[5] The CI has a criminal record. In 1989, he was sentenced to a term of imprisonment in New Jersey for possession of cocaine with intent to distribute. In 1997, he was sentenced in federal court to a term of imprisonment for an extortionate extension of credit. Further, on January 21, 2005, OCTF investigators found approximately a kilo of cocaine in the possession of the CI. Understanding that he faces a significant prison sentence if prosecuted and convicted for the cocaine found on January 21st, he indicated in a debriefing that immediately followed the discovery and seizure that he wanted to cooperate with law enforcement. In that and subsequent debriefings, he has disclosed details of his previous involvement in cocaine distribution conspiracies (including identifying co-conspirators and their methods of distribution). The CI has also admitted to investigators in this case that he is an associate of the Gambino crime family, and has outlined his recent involvement in construction/labor union frauds and interaction with members and associates of the Gambino and Genovese crime families, including capos in the two families (who would likely seek to harm or kill the CI if his cooperation were known to them). Based on independent investigation done by investigators at OCTF and DOL, including through the review of information provided by pen register/trap and trace devices, conventional surveillance, and the

11

20. Based on surveillance and my debriefings of the CI, I know that the CI met with Calvo on February 15, 19, 22, 25, March 4, 10, 11, 21, 24, and April 11, and 14, 2005.

21. Nicholas Calvo and the CI first discussed the elements of a bribery scheme on February 15, 2005. During a meeting they held on that date, Calvo stated that he wanted to take care of Anthony Delvecchio and Mike King of Schiavone Construction. The CI agreed with Calvo that the CI would pay Calvo $25 per dump truck load and that Calvo would share that money with King and Delvecchio. Calvo represented that Delvecchio and King would use their influence within Schiavone to obtain additional work for the CI's company, particularly at a job to be performed at the South Ferry Terminal in Manhattan. Among other things, Calvo also told the CI that he was paying Mike King money in return for work he has obtained from Schiavone removing scrap metal from Schiavone jobs.

22. On March 4, 2005, the CI met with Calvo and another man, Gino Cracolici, at the CI's company yard in Staten Island. Calvo reported in the meeting that Mike King was going to arrange to "sabotage" a particular purchase order that Schiavone was issuing to another contractor on the Croton Water Treatment Project in order to give the work to the CI. Cracolici is interested in the amount of work that the CI's company gets from the job because he has made a deal with the CI to take payments of $40 per dump truck load (including from all of the CI's work for Schiavone) to allow the CI to have unlimited access to a land fill project in New Jersey known

---

review of consensual recordings made by the CI, said disclosures are regarded as truthful and consistent with the information developed by the investigation and I view the information the CI provides as reliable.

as "Endcap." Cracolici had previously been introduced to the CI by Calvo.[6] Cracolici presented a business card to the CI stating that he was a representative of "LIR Consulting." The CI has made payments to Cracolici in this regard. Calvo further reported at the meeting on March 4th that Mike King will do "what he has to do to" get the Croton job for the CI, and that the "South Ferry job is in the bag."

23. Cracolici and Calvo are in frequent contact over the telephone. Between March 11, 2005, and April 12, 2005, 425 calls have occurred between the Calvo cell phone and a cell phone used by Cracolici, according to pen register and trap and trace data and phone company records.

24. On March 10, 2005, Cracolici told the CI that he has connections to the Gambino crime family, in particular, that he is a "cousin through marriage" of Danny Marino and that he is also related through marriage to George Lombardozzi. I understand through accounts of federal criminal trials, media accounts and FBI records that Lombardozzi and Marino are long-time members of the Gambino crime family. Cracolici also told the CI on March 10, 2005, that he has "more work" for the CI, and that "Nick" [Calvo] will tell him about it.

25. On March 10, 2005, the CI and Calvo had a meeting in the CI's office in Staten Island in which they discussed, among other things, the CI's paying money to Mike King and Calvo's paying money to Mike King for his scrap metal removal work. Calvo reported that he had to call his office to get the "scrap metal money" for Mike King.

26. On March 11, 2005, Calvo and the CI met with Mike King. The CI gave

---

[6] The CI reported to me in a debriefing session in March that Joe Mangano introduced Cracolici to Nicholas Calvo. The CI understands from his dealings with Calvo that Calvo is connected to Joe Mangano and the Genovese family.

13

$1,500 to Calvo and King, and they discussed obtaining additional work for the CI.

27. On March 21, 2005, the CI met with Calvo and Michael Schlaefer (who is also a representative of LIR Consulting, the same company as Cracolici). Among other things, the CI asked Calvo to help him in dealing with Local 282 of the Teamsters Union. [Calvo had reported to the CI on March 4, 2005, that he "is close with Tommy Gesualdi," a business agent of Local 282.] Both Calvo (utilizing the Calvo cell phone) and Cracolici (using the Cracolici cell phone) are in frequent telephone contact with Schlaefer. According to pen register and trap and trace data, between March 11, 2005, and April 11, 2005, 411 calls have occurred between the Calvo cell phone and a cell phone listed to "Michael Schlaefer Corp., in Belleville New Jersey" [assigned the MIN (973) 632-4400, per phone company records, the number listed on Schlaefer's LIR Consulting business card; "the Schlaefer cell phone"]. Between March 9, 2005, and April 12, 2005, 459 calls have occurred between the Cracolici cell phone and the Schlaefer cell phone.

28. On March 31, 2005, the CI met with certain management employees of Schiavone regarding the Croton Project, the CI said. The Schiavone personnel included Bob Rhodes, Jerry Tina, Carl Cosenza, Fred Bunker, and someone the CI recalled as "Steve." Bunker and Cosenza told the CI that they (I. E., Schiavone) would pay the expense of installing a phone line and hiring a secretary at T&M's office to handle only Schiavone projects.

29. On April 1, 2005, the CI made a consensual recording of a conversation with Jerry Tina, a Schiavone employee, in which I heard Tina instruct the CI that he wanted "a girl" to answer a phone with the greeting "T&M" in "Marina's trailer." Tina also told the CI that he wanted a price quote "on T&M letterhead."

30. On April 5, 2005, the CI made a consensual recording of another

14

conversation with Jerry Tina, in which I heard Tina tell the CI that "Rick Bunker and Steve Molon" [of Schiavone] want to "meet with Marina." Tina also reminded the CI that if he needs to speak with people about the Croton Project he needs to say that he is "T&M Maintenance."

31. On April 7, 2005, the CI made a consensual recording of a conversation with Nelson Sanchez of Schiavone, in which I heard Sanchez tell the CI that "fuel slips" certifying the use of a certain grade of fuel in the dump trucks that will service the Croton Project need to be on "T&M letterhead" [not that of the CI's company].

32. On April 11, 2005, the CI met again with King and Calvo and made an additional payment to them.

33. On April 12, 2005, the CI made a consensual recording of another conversation with Nelson Sanchez, in which I heard Sanchez inform the CI that he (Sanchez) would "take care of" the preparation of 2' by 2' "T&M" signs which will be affixed to trucks owned and operated by the CI which will be used on the Croton Project.

34. On April 14, 2005, the CI arranged to meet King and Calvo in the vicinity of the 30th Street job to discuss various matters relating to the WBE fraud, including increasing the price of the job to cover the 7% charge from Marina Poetsma, potential problems with Local 282 of the Teamsters Union and the preparation of special "T&M" (the name of the "WBE" company) signs by Schiavone employees to be placed on trucks owned by the CI.

35. According to information from the pen register and trap and trace device, Calvo routinely uses the Calvo cell phone to communicate with the CI about the scheme. Between January 19, 2005, and April 12, 2005, 219 calls occurred between the CI's cellular phone and the Calvo cell phone, with approximately 15% of the calls initiated by Calvo. The Calvo cell phone

15

has also received two calls in March 2005 from a telephone listed to Schiavone Construction at 351 10th Avenue in Manhattan (the site of the 30th Street and Tenth Avenue job).

36. I have been informed by the CI that Calvo has made calls to and received calls from Mike King on the Calvo cell phone in his presence.

37. In my opinion, pursuant to the aforementioned bribery scheme, profit that should be realized by Schiavone (the employer of King and Delvecchio) will instead be (and has already been) diverted into the pockets of their employees participating in the scheme. Further, contracting fees that should be paid to a lawful WBE are instead being wrongfully diverted to a bogus WBE, where a principal of the bogus WBE will be diverting the money to the CI's company. Further, I have obtained from the CI copies of business records which have been falsified in aid of the WBE fraud.[7]



Surveillance

38. Conventional physical surveillance was performed by investigators in this case on Calvo on March 22, 29, 31, and on April 4, and 11, 2005. On March 22, 2005, Calvo was observed at approximately 1 p.m. in the vicinity of 73 Sullivan Street in Manhattan. The area is not far from "social clubs" on Sullivan Street and Thompson Streets affiliated with the Greenwich Village crew of the Genovese family, which I know about from speaking with investigators, published accounts and case records. [Calvo has recently told the CI that he is "with" Joe Mangano, the son of Venero "Benny Eggs" Mangano, who is currently imprisoned on a federal

---

[7] The documents consist of a "letter of transmittal" from Schiavone Construction Company sent to the attention of the CI as a representative of the fraudulent WBE signed by Nelson R. Sanchez, Project Engineer relating to testing of soil samples from the Croton Project. Further, any business records purporting to denominate the fraudulent WBE as legitimate will have been falsified. According to the CI the value of the WBE work will likely be in the hundreds of thousands of dollars.

16

racketeering conviction.] Calvo had met earlier in the day, at 12:10 p.m., with Michael King of Schiavone at the 30th Street and 10th Avenue job. On March 29, 2005, Calvo was again observed in Greenwich Village, this time in the vicinity of the corner of Thompson Street and Houston Street. He was seen meeting with an unidentified man in the D'Angelo Café at 108 Hudson Street for approximately twenty minutes. Both men appeared to the investigators to be wary of surveillance.

39. Calvo has been observed using evasive driving techniques, such as pulling over and making multiple turns for no apparent reason when a shorter route was available. On April 4, 2005, he was observed driving his car out the back gate of his residential community, but then resumed his usual route in traveling to his destination. Further, the UM with whom he met on March 29th at the corner of Thompson and Houston Streets in Manhattan was also seen using evasive driving techniques, such as false turn signals. Gino Cracolici has also been surveilled, and he too has used evasive driving techniques, particularly after meeting with the CI.

Monitoring

40. The cellular telephone included in this application will be monitored at a wire tap plant located in the area covered by the New York State Supreme Court, Second Department.

Eavesdropping is Necessary

41. Based upon the foregoing, there is probable cause to believe that Nicholas "Nick" Calvo, Michael "Mike" King, Anthony Delvecchio, their agents, co-conspirators and others as yet unknown, are engaged in, and continue to engage in, the crimes of Commercial Bribing in the First Degree (Penal Law Section 180.03), Commercial Bribe Receiving in the First

17

Degree (Penal Law Section 180.08), Falsifying Business Records in the First Degree, Grand Larceny and Conspiracy to commit those offenses in violation of Section 175.10 and Articles 155 and 105 of the Penal Law of the State of New York. However, there is much necessary information we cannot learn and evidence we cannot gather unless court-authorized eavesdropping is allowed on the Calvo cell phone. For example, we cannot learn all of the names and roles of Calvo's co-conspirators who take part in the day-to-day operation of his illegal activities. We have learned who some of these individuals are, but in order to successfully perpetrate the various aspect of the criminal scheme it requires the coordination of multiple individuals, such as persons employed at construction sites, or who speak and interface with Michael King, or persons affiliated with organized crime who under the strict rules of La Cosa Nostra must receive a share of criminal proceeds of their criminal associates, such as Calvo. The identities of such people are still unknown to us. The full scope of this conspiracy cannot be ascertained without the eavesdropping requested.

42. Furthermore, thus far the use of conventional surveillance techniques has been unsuccessful in achieving all of the objectives of this investigation. Calvo has utilized surveillance-avoidance driving techniques. Such behavior is an indication that he is concerned and cautious about his illegal activities being detected by law enforcement authorities.

43. Because the principal subject [and others with whom he interacts] is so surveillance-conscious it is futile and could possibly imperil the investigation to try to follow the subjects without some prior knowledge of where they are going, with whom they are meeting and for what purpose, information that would be gleaned by intercepting the subjects' conversations.