# Protass Law PLLC

260 Madison Avenue
22nd Floor
New York, NY 10016

T: 212-455-0335
F: 646-607-0760
hprotass@protasslaw.com

April 2, 2019

VIA FEDERAL EXPRESS AND ECF

Honorable Jack B. Weinstein
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

Re: United States v. Frank Cali, Case No. 08-CR-76 (JBW)

Dear Judge Weinstein:

      I represented Frank Cali in the referenced matter and write today in opposition to the March 20, 2019 letter request of the New York Times (the "NYT") for access to Mr. Cali's July 31, 2008 sentencing memorandum, which was submitted to this Court in advance of his August 7, 2008 sentencing hearing but which was not filed electronically via ECF.[1]

      As this Court no doubt knows, Mr. Cali was murdered on March 13, 2019 outside his home on Staten Island, NY – an event that garnered widespread press attention, including approximately a half-dozen articles in the NYT. On March 20, 2019 the NYT submitted a letter to this Court seeking access to Mr. Cali's sentencing memorandum (subject to redactions for any sensitive personal information) based on what the NYT describes as "renewed interest in Mr. Cali's criminal history, including his conviction in this Court for extortion conspiracy." Initially, it bears noting that the NYT had not published any article about Mr. Cali before his March 13, 2019 murder. Thus, the NYT's interest in Mr. Cali is not "renewed" because it never previously existed. In any event, on March 21, 2019 this Court entered an Order directing the parties to respond to the NYT's March 20, 2019 letter and "explain why" Mr. Cali's July 31, 2008 sentencing memorandum "should not now be" electronically filed via ECF. This letter is respectfully submitted in response to this Court's March 21, 2019 Order.

---

[1] I am enclosing a copy of Mr. Cali's July 31, 2008 sentencing memorandum with this letter. See Exhibit 1.

## BACKGROUND

On February 7, 2008 the government unsealed the 169-page Indictment in the referenced matter, charging the 62 defendants named therein with a variety of criminal offenses. (Docket No. 1.) The majority of those defendants (including Mr. Cali) were arrested on the same day. (Docket No. 118.) Mr. Cali and several of his co-defendants were initially held without bail. (Docket No. 119.) On March 5, 2008 the Honorable Roanne L. Mann set bail for Mr. Cali. (Docket Nos. 400, 404 and 405.) Because those bail conditions were so onerous, though, Mr. Cali decided to remain in detention pending trial. (Docket No. 405.)

Counts 38 and 39 of the Indictment charged Mr. Cali with violations of 18 U.S.C. § 1951 (conspiracy and substantive counts, respectively). (Docket No. 1.) Notably, Mr. Cali was not charged with participation in the RICO conspiracy alleged in Count 1 of the Indictment. (Id.) Rather, Counts 38 and 39 of the Indictment alleged his participation with six co-defendants in an effort to extort an individual (referred to in the Indictment as "John Doe #4" and discovered at the time to be an individual named Joe Vollaro) in connection with the construction of a NASCAR track on Staten Island. (Id.) On June 3, 2008 Mr. Cali pled guilty to Count 38 of the Indictment, charging a conspiracy to violate 18 U.S.C. § 1951(a). (Docket No. 756.) On August 7, 2008 this Court sentenced him to 18 months imprisonment. (Docket No. 1164.) Following my discovery of an error by the government in calculating the amount of money purportedly extorted from Mr. Vollaro ($8,000, not $13,000), which had the effect of reducing Mr. Cali's Guidelines offense level by two levels, on January 16, 2009 this Court resentenced Mr. Cali to 16 months imprisonment. (Docket No. 1750.)

## ARGUMENT

A.  This Court Did Not Require that Mr. Cali
    or Any of His Co-Defendants File Their
    Sentencing Memoranda Electronically Via ECF

This Court did not require that Mr. Cali or any of his co-defendants file their sentencing memoranda electronically via ECF. Rather, on July 11, 2008 this Court entered two Orders (Docket Nos. 919 and 920) setting sentencing dates for each defendant who had pled guilty as of that date and directing that "[a]ll sentencing submission[s] shall be submitted at least one week before sentencing. Replies shall be submitted two days before sentencing. All submissions shall be delivered to case manager Ms. June Lowe at the clerk's office." Thus, on July 31, 2008 (one week before Mr. Cali's August 7, 2008 sentencing hearing) I submitted Mr. Cali's sentencing memorandum to this Court (and sent a copy to the government). Significantly, on the morning of Mr. Cali's August 7, 2008 sentencing hearing, I submitted a short letter to this Court withdrawing certain of the arguments presented in Mr. Cali's July 31, 2018 sentencing memorandum. See Exhibit 2. Those arguments therefore are, by definition, no longer a part of his sentencing memorandum. This Court sealed my August 7, 2008 letter at Mr. Cali's sentencing hearing. (Docket No. 2277 at 3:19-4:3.)

B.  All of the Information Sought by The New
York Times Is Already Publicly Available

The NYT's March 20, 2019 letter states that it is seeking the release of Mr. Cali's sentencing memorandum because his murder has, according to the NYT, "given rise to renewed interest in Mr. Cali's criminal history, including his 2008 conviction in this Court for extortion conspiracy." A review of the docket sheet from Mr. Cali's case demonstrates that all of the information that the NYT seeks is already publicly available.

For example, on August 3, 2008 the government filed an extensive memorandum seeking the pre-trial detention of Mr. Cali and several of his co-defendants. (Docket No. 71.) That detention memorandum provided detailed background information concerning Mr. Cali and the following narrative of his alleged criminal conduct:

> Cali is charged with extortion of John Doe #4 relating to his work at the NASCAR construction site. The evidence of Cali's involvement is strong. As set forth below, it consists of testimony of a cooperating witness which is corroborated by consensually recorded conversations.
>
> In January 2006, NASCAR [began] construction on a racetrack in Staten Island. Recine Trucking, a company under the control of [one co-defendant], was among the first companies hired to bring fill to the site. Thereafter, [another co-defendant] acquired exclusive dumping rights at the site for John Doe #4.
>
> From late January 2006 to May 2006, [several co-defendants and Mr. Cali] negotiated the amount of extortion John Doe #4 would be required to pay for the exclusive dumping rights. Eventually, John Doe #4 received those rights on the condition that he make extortion payments of $.50 per yard of fill dumped to [two co-defendants], and $.50 per yard of fill dumped to [Mr. Cali and one co-defendant].
>
> Before John Doe #4 could begin dumping at the site pursuant to these terms, the exclusive dumping deal fell through. Later, after a new deal was worked out, [two co-defendants, but not Mr. Cali] directed John Doe #4 to take the job on the condition that he pay them $1 for every yard of fill dumped at the site.
>
> John Doe #4 was also required to make a one-time $9,000 payment to NASCAR employee Todd Polakoff on behalf [of] NASCAR executive William Kilgannon.
>
> John Doe #4 worked at the site for a short time and made approximately $13,000 in extortion payments to [one co-defendant], who collected the extortion payments for [two other co-defendants].

3

> The cooperating witness's testimony is corroborated by recordings made of John Doe #4's conversations with [several co-defendants], including scores of recordings detailing the extortion of John Doe #4 in connection with the NASCAR construction site. In at least seven separate conversations, including several in which Cali has been explicitly referenced by name, co-conspirators have discussed his role in the extortion of John Doe #4.
>
> The cooperating witness's testimony is further corroborated by surveillance confirming John Doe #4's contacts with [several co-defendants] and the participants in many of the recorded conversations. In addition, multiple cooperating witnesses . . . are expected to testify that individuals and companies being extorted [had to] make the extortion payments demanded of them or face retaliation against their businesses, property or persons.

Additionally, the government's detention memorandum provided the following detailed narrative of Mr. Cali's alleged prior criminal conduct:

> Cali has no arrests or convictions however, several cooperating witnesses are expected to testify as to his [alleged] history of criminal activity, including illegal gambling, extortion, fraud and loansharking.
>
> Two cooperating witness . . . are expected to testify that in the late 1990s, Cali was involved in operating illegal joker poker gambling machines out of several establishments in Brooklyn, including approximately four or five machines in Café Italia in Brooklyn. Cali split a percentage of the gambling profits with the owner of the restaurant with 10 percent off the top going to [certain alleged associates]. Cali also had approximately two or three machines in a café on 20th Avenue in Brooklyn and a soccer on 70th Street in Brooklyn.
>
> Those cooperating witnesses are expected to testify that in the 1990s, Cali was involved in overseeing the [interests of certain alleged associates] in the annual Italian Feast on 18th Avenue in Brooklyn. [Those alleged associates] received a percentage of the fees charged for the booths and rides, which generated tens of thousands of dollars each year. Cali split the money with [certain of those alleged] associates . . . .
>
> Those cooperating witnesses and another cooperating witness . . . are expected to testify that in the mid-1990s, Cali was involved in a telephone card fraud with [one co-defendant and another

> individual], in which they bought calling cards containing air-time minutes from telephone companies, such as WorldCom, and then sold them without paying the telephone companies . . . ma[king] tens of millions of dollars from this fraud.
>
> One of the cooperating witness is expected to testify that in the early to mid-1990s, the cooperating witness was involved in loansharking with Cali. The cooperating witness loaned Cali money, which Cali in turn loaned to others at a usurious interest rate. The cooperating witness loaned Cali approximately $10,000, which Cali repaid in the mid-1990s with money he made from the [purported] telephone card fraud.

And, finally, the government's detention memorandum provided the following detailed narrative of the evidence that the government was prepared to offer at trial to establish Mr. Cali's purported guilt:

> Here, the government will prove the elements of the crimes through, among other evidence, the testimony of cooperating witnesses, consensual recordings and surveillance. One cooperating witness is expected to testify about Cali's involvement in the extortion and conspiracy to extort John Doe #4 in connection with the NASCAR construction site. That cooperating witness will lay out the scheme by which [certain individuals] provided the entree for John Doe #4 to obtain work at the site by securing the exclusive rights to dump fill and, once in place, how they exerted extortionate control over him – at the risk of losing the work. The cooperating witness is expected to testify that the extortionate control was exerted by Cali and [certain other individuals] who siphoned a percentage of the profits from John Doe #4.
>
> The cooperating witness' testimony is corroborated by dozens of recorded conversations pertaining to the NASCAR construction site extortion including several conversations implicating Cali and setting forth his participation. That evidence is further corroborated by at least three other cooperating witnesses . . . .

  In addition to the foregoing, the government's detention memorandum provided personal detail concerning Mr. Cali, including, among other things, detail concerning his family (including the names of family members and their relation to Mr. Cali), the government's surveillance of Mr. Cali, and consensually recorded conversations in which Mr. Cali was mentioned. Similarly, my memorandum in opposition to the government's detention memorandum (Docket No. 139) provides additional personal detail concerning Mr. Cali, including that he had no criminal history whatsoever, that he was born and raised in the United States of parents who were born in Italy, that he had lived and worked in Brooklyn and Staten Island for his entire life, that he was living with his wife and children in his in-laws' home while

his own home a short distance away was undergoing renovations (a home into which he eventually moved and the home in front of which he was murdered), that he had a brother who lived on Staten Island with his family, and that he ran a Brooklyn-based business that imported specialty foods and wine and employed five people.

Also, the transcripts of Mr. Cali's two bail hearings – one on February 19, 2008 (Docket No. 283) and a second on March 5, 2008 (a copy of which does not appear to have been posted electronically on the docket sheet) detail much of the same information as well as information not contained in the foregoing pleadings, such as specific government assertions concerning uncharged criminal conduct in which Mr. Cali purportedly engaged, surveillance of Mr. Cali undertaken by the government, the assets offered in support of Mr. Cali's bail application, and communications that Mr. Cali purportedly had with certain co-defendants and certain other individuals.

Finally, as noted in this Court's March 21, 2019 Order, this Court's Statement of Reasons for the sentence it imposed on Mr. Cali is publicly available. (Docket No. 1751.) That Statement of Reasons details this Court's Guidelines offense level calculation and the reasons for the sentence that this Court imposed on Mr. Cali.

Thus, simply put, there is already more than enough publicly available information concerning Mr. Cali to satisfy the NYT's need for information arising from what it describes as "renewed interest in Mr. Cali's criminal history, including his 2008 conviction in this Court for extortion conspiracy." Given the absence of any additional material detail in Mr. Cali's sentencing memorandum concerning his "criminal history" or conviction in the instant matter (that is, the subjects about which the NYT expressed interest), there is no need for the release of Mr. Cali's sentencing memorandum, particularly given the context in which it is sought (that is, to sell newspapers by writing additional news stories following his murder).

      C.      No Need Exists for the Release of Mr. Cali's Sentencing Memorandum Because the Transcript of His Sentencing Hearing Is Publicly Available

The transcript of Mr. Cali's August 7, 2008 sentencing hearing is also publicly available. (Docket No. 1141.) It reflects that I asked for a time-served sentence of six months imprisonment and reflects the arguments that I presented in Mr. Cali's sentencing memorandum. Among other things, that transcript demonstrates that I presented argument concerning Mr. Cali's Guidelines offense level calculation and that I argued that the following factors supported a time-served sentence of six months imprisonment: (1) the facts as alleged by the government itself; (2) the absence of any criminal history; (3) Mr. Cali's business background (including the business that he owned and operated); and (4) Mr. Cali's plans for the future following his release from prison (a cardboard packaging company that he had started shortly before his arrest). Ultimately, this Court sentenced Mr. Cali to 18 months imprisonment (the top end of his Guidelines range of imprisonment).[2] Given the arguments presented at Mr. Cali's sentencing

---

[2]    As detailed above, on January 16, 2009 this Court resentenced Mr. Cali to 16 months imprisonment after I discovered that the government had erroneously calculated the amount of

hearing and this Court's responses to same, including in its written Statement of Reasons (Docket No. 1751), no material information will be added to that which is already publicly available concerning "Mr. Cali's criminal history, including his 2008 conviction in this Court for extortion conspiracy" if his sentencing memorandum is released. Rather, as detailed below, disclosure of Mr. Cali's sentencing memorandum will only exacerbate an already extraordinarily painful episode for Mr. Cali's family.

        D.      Releasing Mr. Cali's Sentencing Memorandum Would Be Hurtful and Insensitive

Mr. Cali's March 13, 2019 murder drew widespread press attention. All of the New York newspapers and local television stations extensively covered his death. The New York Post and the N.Y. Daily News even featured Mr. Cali's murder on their covers ("Gambino Boss Whacked" and "Who*Don*It?" from the New York Post, and "Lured to His Death" and "Cali's Killer Collared" from the N.Y. Daily News). National news outlets including CNN, MSNBC, Fox News and CNBC covered Mr. Cali's murder. Newspapers around the country ranging from the Washington Post to the Los Angeles Times to the Miami Herald to the Chicago Tribune reported on Mr. Cali's killing. And international news organizations such as the BBC, the Daily Mail International, Le Monde and La Repubblica even covered the story of Mr. Cali's death. Indeed, a simple Google search for the phrase "Frank Cali" returns hundreds of thousands of hits. And, as any New Yorker would know from watching local television coverage, news crews/cameras were camped out on Mr. Cali's street on Staten Island and news helicopters hovered over his home in reporting on his death.

Mr. Cali's murder was a shocking and traumatic event for his family. The harrowing pain and loss they experienced and continue to experience is all the more distressing because it is being lived out in real-time in the public spotlight. Regardless of whether Mr. Cali was who the government and the press have portrayed him as being, his wife, children and family did not choose to have their lives splashed across television screens and newspapers worldwide. They did not choose to have their lives irrevocably defined by what is written by newspaper reporters and read by broadcast journalists. And they did not choose to have their lives disrupted by intensive and relentless media coverage.

Mr. Cali's wife, children and family have suffered and will continue to suffer from the loss of their husband, father, son, uncle and cousin. They deserve and are entitled to privacy and respect at this intensely sensitive time. Given that, as detailed above, all of the information that the NYT could possibly want or need concerning Mr. Cali is already publicly available – indeed, it is already a quite robust collection of information– no need exists for the release of Mr. Cali's sentencing memorandum. As detailed in the hundreds (if not thousands) of news reports about his death, the story of Mr. Cali's murder is about him and him alone. It is about the man accused of murdering Mr. Cali (Anthony Comello). But the story is not and should not be about Mr. Cali's family or what they said about him as a human being more than a decade ago.

---

money that had purportedly been extorted from Mr. Vollaro ($8,000, not $13,000), which resulted in a two-level decrease in Mr. Cali's Guidelines offense level. (Docket No. 1750.)

    E.      The Cases Upon Which the New York Times Relies in Seeking Release of Mr. Cali's Sentencing Memorandum Are Inapposite

The NYT relies principally on three cases in seeking the release of Mr. Cali's sentencing memorandum. All three cases are inapposite.

First, United States v. Alcantara, 396 F.3d 189 (2d Cir. 2005) details general principles concerning whether plea and sentencing proceedings should be held publicly and the requirements for closing such proceedings. Unlike the instant matter, though, "no member of the public or press [] complained" about the proceedings at issue in Alcantara, which were held in the judge's robing room rather than in a public courtroom. Id. at 202. Thus, Alcantara provides no specific guidance to this Court for evaluating the particulars of the NYT's request (other than the general platitudes contained therein concerning public access to court proceedings) and no basis for the considering the unique privacy interests of Mr. Cali's family here.

Second, in United States v. Munir, 953 F. Supp. 2d 470 (E.D.N.Y. 2013), Bloomberg News sought disclosure of a defendant's sentencing memorandum and presentence report, arguing that it should be entitled to such documents because "the public has an interest in knowing the factors considered in criminal sentencing proceedings" and because a lack of access to such documents would leave the public and press "unable to fully evaluate the basis for the conclusions reached in the sentencing of [the defendant]." Id. at 472. By contrast, here, the NYT does not seek the release of Mr. Cali's sentencing memorandum for purposes of understanding the factors this Court considered in sentencing Mr. Cali or the basis for this Court's original 18-month or revised 16-month sentence. Indeed, that information is already readily available to the NYT in this Court's Statement of Reasons (Docket No. 1751) and the transcript of Mr. Cali's sentencing hearing (Docket No. 1141). Rather, the NYT seeks the release of Mr. Cali's sentencing memorandum based on a vague "renewed interest in Mr. Cali's case, including his 2008 conviction in this Court for extortion conspiracy" – information that, as detailed above, is already readily and publicly available.

Finally, in United States v. Huntley, 943 F. Supp. 2d 383 (E.D.N.Y. 2013), former N.Y. State Senator Shirley Huntley cooperated with the government and recorded calls with certain other state and local officials in an attempt at reducing her sentence. Id. at 384. She listed the names of those individuals in her sentencing memorandum, and various members of the press sought her sentencing memorandum so that they could obtain those names. Id. This Court considered whether the premature disclosure of those names might "stymie law enforcement," but ultimately concluded that it would not because there would "be no surprises to the potentially accused by the revelations of their names" and that "[i]nterference with ongoing investigations will be of almost no significance." Id. at 386-87. Thus, in Huntley, the press sought information concerning potential future criminal cases involving public figures – a benefit for "citizens who require full information about the workings of their government if they are to govern effectively in a democracy." Id. at 385. Here, by contrast, no such interests are served. Rather, at best, the NYT has but a historical interest in an individual, Mr. Cali, in which it had no prior interest.

8

## CONCLUSION

Accordingly and for all of the foregoing reasons, this Court should decline the New York Times' request for the release of Mr. Cali's sentencing memorandum.

If, however, this Court should be inclined to direct the release Mr. Cali's sentencing memorandum (which it should not), it should allow for the redaction of those portions of that sentencing memorandum that I withdrew before Mr. Cali's sentencing hearing, which, by definition, are not a part of his sentencing memorandum. See Exhibit 2. Also, as it did in Munir, this Court should allow for the redaction of those portions of Mr. Cali's sentencing memorandum revealing the names and ages of Mr. Cali's children, the names of the individuals who submitted letters on his behalf, the statements made by those letter-writers, personal and confidential information about Mr. Cali, and quotations and/or information contained in Mr. Cali's presentence report.

Thank you for your consideration and attention to this matter.

Respectfully submitted,

Harlan Protass

Encls.

cc: Kristin Mace, Esq. (via e-mail w/o encls.)
Assistant United States Attorney

David McCraw, Esq. (via e-mail w/o encls.)
Vice President & Deputy General Counsel
The New York Times Company

Benjamin Weiser (via e-mail w/o encls)
The New York Times Company