Harlan J. Protass (HP-2826)
LAW OFFICES OF HARLAN J. PROTASS, PLLC
305 Madison Avenue – Suite 1301
New York, New York 10165
T. 212-922-1080
F. 212-949-8255

**FILED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ MAY 0 1 2019 ★

BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------x
:
UNITED STATES OF AMERICA :
:
      – v – :           Docket No. 08-CR-76 (S-1) (JBW)
:
FRANK CALI, :
:
            Defendant. :
:
-------------------------------------------------------x

## SENTENCING MEMORANDUM
## ON BEHALF OF FRANK CALI

# TABLE OF CONTENTS

Page

TABLE OF CONTENTS ............................................................................................i

TABLE OF AUTHORITIES ................................................................................... iii

INTRODUCTION ..................................................................................................1

PERSONAL BACKGROUND ...............................................................................2

    A.    Mr. Cali's Family Background ................................................................2

    B.    Mr. Cali's Professional Background.........................................................3

ARGUMENT............................................................................................................5

    I.    SENTENCING PROCEDURES AFTER *BOOKER*..................................5

    II.    CALCULATION OF MR. CALI'S
        ADVISORY GUIDELINES OFFENSE LEVEL ......................................6

        A.    The Pre-Adjustments Advisory Guidelines
            Offense Level in Mr. Cali's Plea Agreement ...............................7

        B.    Agreed Upon Adjustments to the Advisory Guidelines
            Offense Level in Mr. Cali's Plea Agreement ...............................7

        C.    Adjustments to the Advisory Guidelines
            Offense Level in Mr. Cali's Plea Agreement
            That He Retained the Right to Contest .........................................8

        D.    Mr. Cali's Offense Did Not Involve Any Express or
            Implied Threat of Death, Bodily Injury or Kidnapping................8

        E.    Mr. Cali's Offense Did Not Involve Any
            Demand From or Loss to the Victim .........................................13

        F.    Mr. Cali Played A Minor Role in
            the NASCAR Construction Project ...........................................15

        G.    This Court Should Determine That Mr. Cali's
            Advisory Guidelines Offense Level is 10....................................17

III.    THIS COURT SHOULD IMPOSE A
        GUIDELINES SENTENCE OF TIME SERVED...............................................17

IV.     IF THIS COURT DOES NOT IMPOSE A GUIDELINES
        SENTENCE OF TIME SERVED, IT SHOULD IMPOSE A
        NON-GUIDELINES SENTENCE OF TIME SERVED......................................19

CONCLUSION.................................................................................................................22

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Gall v. United States,* --- U.S. ---, 128 S.Ct. 586 (2007) ....................................................5, 6, 17, 18

*Rita v. United States,* --- U.S. ---, 127 S.Ct. 2456,
    *reh'g denied,* --- U.S. ---, 128 S.Ct. 19 (2007) ....................................................................18

*United States v. Booker,* 543 U.S. 220, 125 S.Ct. 738 (2005)..............................................5, 6

*United States v. Bowles,* 260 Fcd. Appx. 367 (2d Cir. 2008) ....................................................6

*United States v. Contreras,* 247 Fed. Appx. 293 (2d Cir. 2007) ...............................................6

*United States v. Crosby,* 397 F.3d 103 (2d Cir. 2005).......................................................5, 6, 17

*United States v. Ekwunoh,* 888 F. Supp. 369 (E.D.N.Y. 1994) ..............................................18

*United States v. Fernandez,* 443 F.3d 19 (2d Cir.),
    *cert. denied,* --- U.S. ---, 127 S.Ct. 192 (2006).....................................................................18

*United States v. Florez,* 447 F.3d 145 (2d Cir.),
    *cert. denied,* --- U.S. ---, 127 S.Ct. 600 (2006).......................................................................5

*United States v. Innarelli,* 524 F.3d 286 (1st Cir. 2008)............................................................6

*United States v. Jones,* 460 F.3d 191 (2d Cir. 2006) ...........................................................6, 19

*United States v. Jones,* Docket No. 05-5879-cr.,
    2008 WL 2500252 (2d Cir. June 24, 2008) ......................................................................5, 19

*United States v. Marshall,* 186 Fed. Appx. 125 (2d Cir. 2006)...........................................5, 19

*United States v. Ministro-Tapia,* 470 F.3d 137 (2d Cir. 2006)...........................................6, 19

*United States v. Nellum,* No. 2:04-CR-30-PS,
    2005 WL 300073 (N.D. Ind. Feb. 3, 2005) ..........................................................................21

*United States v. Speed Joyeros, S.A.,* 204 F. Supp. 2d 412 (E.D.N.Y. 2002) ..............................18

<u>Page(s)</u>

<u>Statutes</u>

18 U.S.C. § 1951 ..........................................................................................................1

18 U.S.C. § 2624 ........................................................................................................19

18 U.S.C. § 3553(a) ...............................................................2, 5, 6, 17, 18, 19

U.S.S.G. § 2B3.1 ..............................................................................7, 8, 13, 15

U.S.S.G. § 2B3.2 .......................................................................7, 8, 9, 13, 15, 17

U.S.S.G. § 3B1.1 ...................................................................................................15

U.S.S.G. § 3B1.2 ...............................................................................7, 16, 17, 20

U.S.S.G. § 3E1.1 .........................................................................................7, 17

U.S.S.G. § 5K2.0 .........................................................................................7, 17

P.L. No. 110-199, 122 Stat. 692 .....................................................................19

Frank Cali, by his undersigned counsel, respectfully submits this Sentencing

Memorandum and the attached exhibits in support of his request for a sentence of time served – a

sentence that: (1) comports with the advisory Guidelines calculation in Mr. Cali's Plea

Agreement with the Government; and (2) equals the six months of pretrial detention that he has

*already served* at the Metropolitan Detention Center (the "MDC") and the Queens Detention

Facility (the "Queens Facility").[1]  We hope that it will add valuable information to the

Presentence Investigation Report (the "PSR"),[2] and that it will assist the Court in determining

that the six months Mr. Cali has already served is a just, appropriate and reasonable sentence.

## INTRODUCTION

Mr. Cali was arrested on February 7, 2008 (six months ago to the day), and was

charged with violations of 18 U.S.C. § 1951 in Counts 38 and 39 of the Indictment (conspiracy

and substantive counts, respectively).  Those counts allege his participation with six other

individuals in an effort to extort John Doe #4 (now known to be Joe Vollaro) in connection the

construction of a NASCAR racetrack on Staten Island.  On June 3, 2008 Mr. Cali pled guilty to

one count of the Indictment (Count 38), charging a conspiracy to violate 18 U.S.C. § 1951(a).

---

[1]     The Queens Facility is operated by The GEO Group, Inc., a private correctional and detention management company under contract with the U.S. Bureau of Prisons. Unlike the MDC, the Queens Facility prohibits contact visits. Thus, detainees at the Queens Facility must communicate with their families over a phone and through a glass partition.

[2]     Mr. Cali was charged in only 2 of the Indictment's 80 counts (Counts 38 and 39), and his name appears substantively on only 2 of the Indictment's approximately 170 pages. Mr. Cali was not charged in the alleged RICO conspiracy that comprises more than half of the Indictment (Count 1). Moreover, Mr. Cali pled guilty to only one count of the Indictment (Count 38), charging a conspiracy to violate 18 U.S.C. § 1951(a).

Mr. Cali's PSR, however, details *all* of the offenses allegedly committed by *all* of the defendants herein in a report that runs close to fifty pages long. That irrelevant and highly prejudicial information has no place in Mr. Cali's PSR. Indeed, its presence will undoubtedly affect Mr. Cali's security classification by the U.S. Bureau of Prisons should this Court impose a prison term. This Court therefore should strike paragraphs 4 to 95, paragraphs 99 to 134 and paragraph 136, as well as paragraphs 137 and 139 (to the extent that they contain factual assertions unrelated to the offense to which Mr. Cali pled guilty) – all of which were improperly included in Mr. Cali's PSR as they have nothing to do with Mr. Cali or the offense for which he pled guilty.

Significantly, Mr. Cali *was not charged with* and *did not plead guilty to* being a participant in the RICO conspiracy charged in Count 1 of the Indictment.

Mr. Cali accepts responsibility for his conduct. Nothing submitted by or on his behalf is intended to diminish or detract from the seriousness of his offense or his complete acceptance of responsibility. In light of (among other things) the Plea Agreement into which Mr. Cali and the Government entered and the six months of pretrial detention that he has already served, as well as the 18 U.S.C. § 3553(a) sentencing factors, we respectfully submit that time served is a fair, just and appropriate sentence.

## PERSONAL BACKGROUND

Mr. Cali, age 43, was born and raised in New York, and continues to maintain strong relationships and ties with his community. He has lived his entire life in Brooklyn and Staten Island, and currently resides with his in-laws on Staten Island while his home a short distance away is undergoing renovations. Significantly, Mr. Cali has no criminal history whatsoever – he has never been arrested, charged or convicted of any criminal offense.

A.  Mr. Cali's Family Background





Mr. Cali's immediate family also lives in New York. His parents were born in Italy but are long-time Brooklyn residents (forty-seven years), and his brother lives on Staten Island with his wife and two children. Likewise, the family of Mr. Cali's wife (including her mother and two brothers) live on Staten Island. Tragically, Mr. Cali's father-in-law was killed in an automobile accident on the Belt Parkway in 1987 when his wife was 11 years old. According to his wife, Rosaria, Mr. Cali "filled a lot of the emptiness" she had a result of her father's death, and "made [her] feel complete." (Exhibit 1.) Similarly, Danny Inzerillo, Mr. Cali's brother-in-law (Rosaria's younger brother), described how Mr. Cali "gave his undivided moral support back when my father had passed away many years ago. My family and I had lost the most important person in our lives and Frank was there to fill the missing piece of our puzzle." (Exhibit 2.)

B.    Mr. Cali's Professional Background

For the past five years, Mr. Cali has served as the President and a part-owner of Bontel U.S.A. Corp. ("Bontel"), a moderately successful Brooklyn-based company that imports specialty foods and wine, and has five employees. (Copies of examples of Bontel's sales brochures are attached as Exhibits 3, 4, 5, 6 and 7.)[3] According to his business partner, Nick Stellato, Mr. Cali "work[s] hard everyday" and has been a "great mentor and innovator especially with the current economy and the uncertainty that lies ahead." (Exhibit 8.) Indeed, "Bontel is currently in business today due [largely] to the foundation and continued support which rest with Frank Cali's many years of experience." (Id.)

---

[3]    Before Bontel's formation, Mr. Cali had several businesses in the food and construction industries.

In addition to being a trusted business partner, Mr. Cali is also a kind and caring "boss." Nina Biscari, who has worked for Mr. Cali for five years, described how he "supported me when I was struggling with my fathers illness, he was very understanding and concerned about me and my family, he told [me] at the time to take as much time [as] I need to help my Mother with my Father." (Exhibit 9.) Ms. Biscari stated further that Mr. Cali "is one of the kindest human being[s]" that she knows, and that it has "been an honor to have worked for" him for the past five years because he is "my mentor, my friend and brother." (*Id.*) Likewise, AnnaMaria Lacchiana, who has worked for Mr. Cali for four years, reported that he "helped me out on a personal level." Ms. Lacchiana is a "single parent raising a child in between working. There are days when I need to care for my child and have been absen[t] from work several days[.] [N]ot only did he excuse me but was concern[ed] about how I was handling my situation at the time." (Exhibit 10.) Like Ms. Biscari, Ms. Lacchiana expressed how Mr. Cali "has been a great person to work with." (*Id.*)

Because of its involvement in the spirits industry, Bontel has both a federal liquor import license and a New York state liquor resale license. Upon information and belief, both federal and New York law require that owners of corporations possessing those types of licenses have no criminal records. Thus and as a result of his guilty plea, Mr. Cali had no choice but to resign as President of and sell his interest in Bontel so as to ensure the corporation's survival and the continued financial well-being of its five employees. (*See* Exhibit 11.) Mr. Cali therefore effectively lost his livelihood as a result of his guilty plea and, upon release, will have to start from "square one" in seeking to support his young and growing family. In this regard, Mr. Cali started a food and cardboard packaging company several months before his arrest, and intends to work on developing and building that business upon release.

ARGUMENT

I.

SENTENCING STANDARDS AFTER *BOOKER*

As the Court knows, the United States Sentencing Guidelines (the "Guidelines") are now advisory, rather than mandatory. *United States v. Booker*, 543 U.S. 220, 244-46, 125 S.Ct. 738, 756-57 (2005); *United States v. Crosby*, 397 F.3d 103, 113 (2d Cir. 2005). Sentencing judges today therefore "enjoy considerable discretion in identifying grounds that can justify a non-Guidelines sentence." *United States v. Jones*, Docket No. 05-5879-cr., 2008 WL 2500252, at *7 (2d Cir. June 24, 2008). They must "consider" the Guidelines but are also required to consider all of the other factors set forth in 18 U.S.C. § 3553(a) in determining and imposing a fair, just and reasonable sentence. *Booker*, 543 U.S. at 245-46, 125 S.Ct. at 757; *Crosby*, 397 F.3d at 112-114. *See also Gall v. United States*, --- U.S. ---, ---, 128 S.Ct. 586, 596 (2007) ("a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. . . . The Guidelines are not the only consideration, however. . . . [T]he district judge should then consider all of the § 3553(a) factors to determine whether they support the sentence requested by the party").

When deciding upon a fair, just and reasonable sentence, "[t]he precise weight" accorded any 18 U.S.C. § 3553(a) sentencing factor – including the Guidelines themselves – rests within the "discretion" of the sentencing court, and the Second Circuit "will not second-guess that determination in reviewing an otherwise reasonable sentence." *United States v. Marshall*, 186 Fed. Appx. 125, 128 (2d Cir. 2006) (citing *United States v. Florez*, 447 F.3d 145, 157-58 (2d Cir.), *cert. denied*, --- U.S. ---, 127 S.Ct. 600 (2006)). *See also Gall*, --- U.S. at ---, 128 S.Ct. at 597 (appellate courts "must give due deference to the district court's decision that the § 3553(a) factors, on a whole, justify" a non-Guidelines sentence). Simply put, sentencing

judges are authorized to consider their "own sense of what is a fair and just sentence under all the circumstances." *United States v. Jones*, 460 F.3d 191, 195 (2d Cir. 2006). *See also United States v. Innarelli*, 524 F.3d 286, 292 (1st Cir. 2008) (once the advisory Guidelines range is calculated, "sentencing becomes a judgment call for the court, and the court may construct a sentence varying from the [Guidelines] based on a complex of factors whose interplay and precise weight cannot even be precisely described") (internal citations and quotations omitted).[4]

In instructing on the practical application of *Booker*, the Second Circuit directed that sentencing courts should: (1) determine the applicable advisory Guidelines range; and then (2) determine, based on all the factors set forth in 18 U.S.C. § 3553(a), whether to impose a Guidelines sentence or a non-Guidelines sentence. *See Gall*, --- U.S. at ---, 128 S.Ct. at 596-97; *Crosby*, 397 F.3d at 113. If this Court "conclude[s] that two sentences equally serve[] the statutory purposes of § 3553, it [cannot] not, consistent with the parsimony clause, impose the higher." *United States v. Ministro-Tapia*, 470 F.3d 137, 142 (2d Cir. 2006).

## II.

## CALCULATION OF MR. CALI'S ADVISORY GUIDELINES OFFENSE LEVEL

We respectfully submit that, consistent with his Plea Agreement (attached as Exhibit 12), this Court should determine that Mr. Cali's advisory Guidelines offense level is 10 and Criminal History Score is I – indicating an advisory Guidelines range of 6 to 12 months imprisonment (in Zone B), of which Mr. Cali has *already served* the minimum term.

---

[4]    *See also United States v. Bowles*, 260 Fed. Appx. 367, 369 (2d Cir. 2008) (post-*Gall* case in which the Second Circuit affirmed a wide variance from the Guidelines because the district court had "considered the sentence in light of the need for deterrence, punishment, retribution, protection of society, rehabilitation, and what would constitute the 'most appropriate fair, just, and reasonable sentence under the circumstances'"); *United States v. Contreras*, 247 Fed. Appx. 293, 295-96 (2d Cir. 2007) (affirming imposition of a non-Guidelines sentence because the court properly considered all of the 18 U.S.C. § 3553(a) factors).

A.   The Pre-Adjustments Advisory Guidelines
     Offense Level in Mr. Cali's Plea Agreement

The Government agreed that Mr. Cali's advisory Guidelines offense level is 15,

subject to certain adjustments detailed below that have the combined effect of reducing that

offense level to 10. Specifically, the pre-adjustments advisory Guidelines offense level

calculation in Mr. Cali's Plea Agreement includes the following:

1.   A base offense level of 18 (U.S.S.G. § 2B3.2(a));

2.   An upward adjustment of 2 offense levels because the
     offense involved an express or implied threat of death,
     bodily injury, or kidnapping (U.S.S.G. § 2B3.2(b)(1));

3.   An upward adjustment of 1 offense level because the
     offense involved an amount demanded or loss to the victim
     of more than $10,000 but less than $50,000 (U.S.S.G. §§
     2B3.2(b)(2) and 2B3.1(b)(7)(B));

4.   A downward adjustment of 2 offense levels because Mr.
     Cali played a minor role in the offense (U.S.S.G. §
     3B1.2(b));

5.   A downward adjustment of 2 offense levels based on
     Mr. Cali's acceptance of responsibility for his offense
     (U.S.S.G. § 3E1.1(a)); and

6.   A downward adjustment of 2 offense levels based on global
     disposition (U.S.S.G. § 5K2.0).

B.   Agreed Upon Adjustments to the Advisory Guidelines
     Offense Level in Mr. Cali's Plea Agreement

The Government also agreed that: (1) it would move for a reduction of 1

additional offense level pursuant to U.S.S.G. § 3E1.1(b) for acceptance of responsibility if Mr.

Cali entered a guilty plea on or before June 6, 2008; and (2) Mr. Cali would be entitled to an

additional downward adjustment of 1 offense level pursuant to U.S.S.G. § 5K2.0 for global

resolution if 52 or more of the defendants pled guilty before his sentencing date.

Both conditions have been satisfied. Mr. Cali pled guilty before June 6, 2008 (specifically, he pled guilty on June 3, 2008). Moreover, more than 52 defendants have pled guilty to date. (*See* Exhibit 13). This Court therefore should reduce the advisory Guidelines offense level calculation set forth above by 2 additional levels to 13 (indicating a 12 to 18 month term of imprisonment), subject to the additional adjustments detailed below.

C.    Adjustments to the Advisory Guidelines
       Offense Level in Mr. Cali's Plea Agreement
       That He Retained the Right to Contest

Pursuant to paragraph 2 of his Plea Agreement, the Government also agreed that Mr. Cali may challenge the applicability of: (1) the two-point enhancement pursuant to U.S.S.G. § 2B3.2(b)(1), which provides for an increase of 2 offense levels for express or implied threat of death, bodily injury or kidnapping; and (2) the one-point enhancement pursuant to U.S.S.G. §§ 2B3.2(b)(2) and 2B3.1(b)(7)(B), which provide for an increase of 1 offense level for demands to or losses by the victim. The Government retained the right to oppose Mr. Cali's challenge.

As is detailed below, this Court should reduce Mr. Cali's advisory to 10 because his offense: (1) did not involve any express or implied threat of death, bodily injury or kidnapping; and (2) did not involve any amount demanded from or lost by the victim.[5]

D.    Mr. Cali's Offense Did Not Involve Any Express Or
       Implied Threat of Death, Bodily Injury or Kidnapping

Mr. Cali's offense involved no express or implied threat of death, bodily injury or kidnapping. Rather, at most, it involved potential economic harm. This Court therefore should not include any enhancement pursuant to U.S.S.G. § 2B3.2(b)(1) in its calculation of Mr. Cali's advisory Guidelines offense level.

🖋

---

[5]      Indeed, we respectfully submit that the Government's agreement to these "carve-outs" in Mr. Cali's Plea Agreement constitutes a tacit acknowledgement that it cannot establish either by a preponderance of the evidence.

First, Mr. Cali never met or interacted with Vollaro in any business or social context, and never personally threatened Vollaro. Indeed, on April 22, 2008 the Government identified 23 tapes made by Vollaro that it asserted implicated Mr. Cali in the charged offenses. (*See* Exhibit 14.) None of those tapes, however, contain recordings of conversations in which Mr. Cali participated and, in fact, Mr. Cali's name is mentioned on only 7 of the 23 tapes.[6] Mr. Cali is not recorded participating in any of the literally hundreds of hours of undercover tapes that Vollaro made, and even the Government conceded that it has no recording of him. (Gov't Detention Mem.[7] at 20.) Thus and even if this Court finds that Vollaro was subjected to express or implied threats of physical harm, it still should not enhance Mr. Cali's advisory Guidelines offense level pursuant to U.S.S.G. § 2B3.2(b)(1) because any such threat did not emanate from Mr. Cali.

Second, any threat to which Vollaro was exposed was one of potential economic harm, not physical harm. As detailed in his allocution, Mr. Cali agreed with others "to obtain money from a trucker in exchange for getting him work at the site proposed [for] construction of a NASCAR track on Staten Island." (*See* Exhibit 15.) Although Vollaro consented to the proposed payment of those funds, "[i]t was reasonabl[y] [] foreseeable that the trucker may have been concerned that his future business would suffer economic harm if he didn't take the work and pay the money." (*Id.*)

The absence of any threat of physical harm is confirmed by the 23 tapes identified by the Government as implicating Mr. Cali, a review of which shows that Vollaro was not subjected to any threat of physical harm, express, implied or otherwise. Rather, those tapes

---

[6]     These 23 tapes span over 2.5 months. Mr. Cali is not mentioned after the third week.

[7]     "Gov't Detention Mem" refers to the Government's Memorandum of Law in Support of the Government's Motions for Permanent Orders of Detention, dated February 7, 2008 (Docket # 71).

reflect the opposite – a cordial and relaxed relationship between Vollaro and those of Mr. Cali's co-defendants with whom he spoke, the sharing of numerous meals, and many lengthy discussions about how both Vollaro and Mr. Cali's co-defendants could profit working together.

Moreover, those tapes establish that Vollaro was actively and affirmatively seeking to work with Mr. Cali's co-defendants to obtain the potentially lucrative fill work at the NASCAR construction site. Among other things, on January 24, 2006 Vollaro stated that "we don't got a problem moving that stuff at all; we can fill that no problem, we could bring a lot of dirt in there." (*See* Exhibit 16.) Similarly, on January 25, 2006 Vollaro held the following exchange with one of Mr. Cali's co-defendants:

| | |
|---|---|
| Co-Defendant: | You could give them a million and a half. You could give them two million. |
| Vollaro: | I could give them whatever they want, in the course of time. Without a doubt. Just give us the specs, let's roll. |
| Co-Defendant: | And you would do it, you would do it faithfully and honestly, honestly and faithfully, where – |
| Vollaro: | 100%. |
| Co-Defendant: | If he needs stone and sand, you'll give him stone and sand. |
| Vollaro: | Whatever he needs. Whatever he needs that we could supply cause what we would do is put the finders out, okay, I need brick. We know everybody in the business. He got brick? Okay, what's the number at the gate? That's the big thing. |

. . . .

| | |
|---|---|
| Co-Defendant: | So let me get this straight. You could faithfully and honestly fill the fill under the specifications that are required. |
| Vollaro: | Yeah. |

(*See* Exhibit 17.) Indeed, Vollaro sought the NASCAR construction site work because he stood to profit tremendously. As described by Vollaro on January 19, 2006, the NASCAR racetrack construction project was "more than a home run" and a "gold mine."

Third, Vollaro was not subjected to any express or implied threat because neither Mr. Cali nor certain of his co-defendants initially knew his identity or that he was involved in the NASCAR construction project. 15 of the 23 tapes identified by the Government as implicating Mr. Cali are conversations between Vollaro and one of Mr. Cali's co-defendants. That co-defendant repeatedly informed Vollaro (on January 21, 2006, January 24, 2006, January 31, 2006 and February 3, 2006) that he had concealed Vollaro's name from the individuals with whom he was working. For example, on January 24, 2006 that co-defendant told Vollaro that the individuals with whom he was working "don't even know who you are." (*See* Exhibit 18.) Likewise, on February 3, 2006 that co-defendant told Vollaro that the people with whom he worked "wanted your name – I didn't give it to them." That neither Mr. Cali nor certain of his co-defendants knew Vollaro's identity confirms that Vollaro was not subjected to any threat of physical harm. Indeed, it is not feasible to threaten an individual whose identity is not known.

Fourth, Vollaro himself was associated with the RICO enterprise charged in Count 1 of the Indictment and, with that status, had no basis for concern about physical harm. For example, the Affidavit of Jonathan Mellone in support of a wiretap application (relevant excerpts of which are attached as Exhibit 19) notes that Vollaro himself reported that he is "an associate of the Gambino crime family" and "outlined his recent involvement . . . with members and associates of the Gambino and Genovese crime families." Indeed, this Court found in connection with the July 8, 2008 sentencing of Louis Filippelli that the "person [who] threatened [Vollaro] is associated with the mob. The circumstances are such that the person threatened is in effect seeking the benefits of the mob, rather than his being coerced. . . . You have not, despite your eloquence, convinced me by a preponderance [of the evidence] that there was a threat of violence."

11

Fifth, Vollaro's close personal connection to many of Mr. Cali's co-defendants demonstrates that he was not subjected to any threat of physical harm. Vollaro enjoyed a cordial and relaxed relationship with several of Mr. Cali's co-defendants, spending time with them on many occasions, sharing meals with their families, visiting each other's homes, spending time with each other's children and even vacationing together. Indeed, in a February 3, 2006 conversation, one of Mr. Cali's co-defendants disclosed that he was having some minor surgery. Vollaro – as any trusted friend would – responded that that co-defendant should "call" him if he "need[s] anything" as he recovered. Likewise, in a March 1, 2006 conversation Vollaro told that same co-defendant that "if there's anything I can do for you, I'm a call away" and that "if I gotta take you anywhere, anything like that . . . I'm there for you, you know that." (*See* Exhibit 20.) This type of behavior over an extended period of time does not typify the conduct of an individual who feels physically threatened. Rather, it indicates the opposite – that Vollaro was comfortable and at ease with Mr. Cali's co-defendants. No rational individual who feels physically threatened would socialize with those who are threatening him or consider placing his family in harm's way.

Finally and as detailed throughout the Indictment, Vollaro was involved in several business transactions with a number of Mr. Cali's co-defendants (including, among others, the NASCAR construction site, a "pump truck" business and several other construction projects). Moreover, several of Mr. Cali's co-defendants referred substantial construction work to Vollaro, and Vollaro profited handsomely from that work. As one of Mr. Cali's co-defendants told Vollaro in a March 23, 2006 conversation: "Will you listen to me? Please? Stick to the construction and we'll get rich. I'm going to get yous rich. I'm telling you. And we're this close to getting rich." (*See* Exhibit 21.) No individual who feels physically threatened would intentionally expose himself to such threats through expanding business relationships with the

individuals making those threats. Vollaro's conduct therefore speaks volumes about the question of whether he felt any threat of physical harm.

Accordingly and in light of all of the foregoing, we respectfully submit that Vollaro was not subjected to any express or implied threat of physical harm. This Court therefore should not include any enhancement pursuant to U.S.S.G. § 2B3.2(b)(1) in its calculation of Mr. Cali's advisory Guidelines offense level.

E.    Mr. Cali's Offense Did Not Involve Any
      Demand From or Loss to the Victim

Mr. Cali's offense did not involve any demand to or loss by Vollaro. This Court therefore should not include any enhancement pursuant to U.S.S.G. §§ 2B3.2(b)(2) and 2B3.1(b)(7)(B) in its calculation of Mr. Cali's advisory Guidelines offense level.

Specifically, *according to the Government's own narrative of Mr. Cali's offense*, NASCAR began construction of a racetrack on Staten Island in January 2006. (Gov't Detention Mem. at 19.)[8] One of Mr. Cali's co-defendants acquired the "exclusive dumping rights" for that construction site for Vollaro. From January 2006 to May 2006, Mr. Cali and several of his co-defendants "negotiated the amount of [money Vollaro] would be required to pay for [those] exclusive dumping rights." (*Id.*) Vollaro ultimately received those exclusive dumping rights on the condition that "he make certain [] payments" per yard of fill dumped at the NASCAR site (specifically, $1.00/yard to be split between Mr. Cali and three of his co-defendants). (*Id.*)

"*Before* [Vollaro] could begin dumping landfill at the [NASCAR] site," however, "the exclusive dumping *deal fell through*." (*Id.*) (emphasis added). Thus, according to the Government itself, Vollaro dumped no fill at the NASCAR site and *Mr. Cali received no payments from Vollaro* pursuant to the terms of this first "deal."

---

[8]    Relevant pages of the Gov't Detention Mem. are attached as Exhibit 22.

According to the Government, "[l]ater" a *"new deal"* was arranged pursuant to which Vollaro was to provide landfill at the NASCAR construction site. (*Id.*) (emphasis added). That "new deal," however, *did not involve Mr. Cali and did not contemplate any payment to Mr. Cali.* Rather, it involved three of Mr. Cali's co-defendants exclusively. (*Id.*) Indeed and to the extent that Vollaro made any payments pursuant to that "new deal" ($13,000 according to the Government), they were made to "Mario Cassarino, who collected the payments for [Nicholas] Corozzo and [Leonard] DiMaria." (*Id.*) In a word, no monies were paid to or for the benefit of Mr. Cali.

This description of the NASCAR construction project is confirmed by the PSR, which describes how Mr. Cali and several of his co-defendants:

> encouraged [Vollaro] to obtain trucking work associated with the development of the [NASCAR] site and discussed the amount of money [Vollaro] would be required to pay them if he began performing trucking work at the site. Eventually . . . [Vollaro] agreed to pay $1 for every cubic yard of fill his trucking company brought to the site, with 50¢ of each dollar to be split between [Domenico] Cefalu and [Frank] Cali, and the other 50¢ to be split between [Nicholas] Corozzo and [Leonard] DiMaria.
>
> *Before* [Vollaro's] trucking company could begin dumping at the site, however, the company that hired him to bring in the fill was fired. . . . [Vollaro] *eventually began to bring fill to the site under a new contract* he arranged with [Todd] Polakoff. Under this Agreement, [Vollaro was] still required [] to pay $1 for every cubic yard of dirt dumped on the site, with the money to be *split between [Nicholas] Corozzo and [Leonard] DiMaria only.* [Vollaro's] company dumped on the site for a short period pursuant to this arrangement before the site was shut down. *[Vollaro] paid $13,000 to Mario Cassarino, who collected the money for [Nicholas] Corozzo and [Leonard] DiMaria.*

*See* PSR ¶¶ 97-98 (emphasis added).

Simply put, the "deal" in which Mr. Cali was involved failed. A second "deal" – *in which Mr. Cali was not involved and from which Mr. Cali did not benefit* – succeeded (in the amount of $13,000). Thus and notwithstanding the Government's decision to charge these two

14

"deals" as one conspiracy, Mr. Cali was not involved in the successful "deal" and did not benefit financially from it.

This conclusion is bolstered by the 23 tapes identified by the Government as implicating Mr. Cali – none evidence the exchange of money in connection with the first "deal." Indeed and because no fill was dumped in connection with the first "deal," the condition precedent to Vollaro's obligation to make payments was never satisfied. Put differently, Vollaro only had to make payments under the first "deal" if he dumped fill pursuant to its terms. Since he never dumped any fill, he never incurred the obligation to make payments, and no payments were ever made.

Accordingly and for all of the foregoing reasons, Mr. Cali's offense did not involve any demand to or loss by Vollaro. This Court therefore should not include any enhancement pursuant to U.S.S.G. §§ 2B3.2(b)(2) and 2B3.1(b)(7)(B) in its calculation of Mr. Cali's advisory Guidelines offense level.

F.      Mr. Cali Played A Minor Role in
        the NASCAR Construction Project

The PSR asserts that Mr. Cali "played an integral role in arranging for [Vollaro] to become established to work at the NASCAR construction site" (PSR ¶ 140) and that Mr. Cali's advisory Guidelines offense level should therefore include a 4 level role enhancement pursuant to U.S.S.G. § 3B1.1(a) (PSR ¶¶ 138, 146). This Court should reject that conclusion and, pursuant to the terms of his Plea Agreement, reduce Mr. Cali's advisory Guidelines offense level by 2 levels based on the minor role that he played in the NASCAR construction project. *See* Plea Agreement at 2 (reflecting the Government's agreement that Mr. Cali played a "minor role" in his offense and is entitled to a downward adjustment of 2 offense levels pursuant to U.S.S.G. § 3B1.2(b)) (attached as Exhibit 12).

Specifically and notwithstanding the PSR's conclusion (which, in any event, is unsupported by any factual basis whatsoever), the 23 tapes identified by the Government as implicating Mr. Cali demonstrate that his involvement in the NASCAR construction project was tangential and peripheral. In particular, those tapes demonstrate that Mr. Cali's role was limited to asking one of his co-defendants on behalf of another co-defendant about a company named "Interstate," which was working at the NASCAR construction site before Vollaro, Mr. Cali or any of his co-defendants became involved in the work at that site. For example, on January 21, 2006 one of Mr. Cali's co-defendants described Mr. Cali's inquiry about Interstate as: "It's not his man. It's a friend – not of his, of everyone – went to Frank Cali and Cali went to me. . . . And he said, 'Frank, can you help me with Interstate?'" Similarly, on February 3, 2006 that same co-defendant stated "I don't know where Frankie falls in," indicating that even he did not understand Mr. Cali's role in the NASCAR project. Indeed, Mr. Cali is not recorded on any of the 23 tapes associated with the NASCAR project, is mentioned on only 7 of those 23 tapes, and is not mentioned after the third week of the 2.5 month period that those 23 tapes span.

Moreover and as detailed above, Mr. Cali was not involved in the second "deal" under which Vollaro was to provide fill to the NASCAR construction site and received no payments therefrom. Rather, that second "deal" involved three of Mr. Cali's co-defendants. In that regard, the one co-defendant who spoke with Vollaro on 15 of the 23 aforementioned tapes repeatedly told Vollaro (on January 25, 2006, January 31, 2006, February 22, 2006, March 1, 2006 and March 21, 2006) that he needed the approval of the three individuals involved in that second "deal" – but not Mr. Cali – before proceeding with Vollaro on the NASCAR construction site project.

In a word, the evidence supports the minor role adjustment agreed upon by the Government in Mr. Cali's Plea Agreement. This Court therefore should reject the PSR's

conclusion that Mr. Cali played a leadership role in the NASCAR construction project, and

reduce his advisory Guidelines offense level by 2 levels pursuant to U.S.S.G. § 3B1.2(b).

G.    This Court Should Determine That Mr. Cali's
      Advisory Guidelines Offense Level Is 10

In light of all of the foregoing, this Court should determine that Mr. Cali's

advisory Guidelines offense level is 10 based upon the following:

1.    A base offense level of 18 (U.S.S.G. § 2B3.2(a));

2.    A downward adjustment of 2 offense levels because Mr.
      Cali played a minor role in the offense (U.S.S.G. §
      3B1.2(b));

3.    A downward adjustment of 3 offense levels based on
      Mr. Cali's acceptance of responsibility for his offense
      (U.S.S.G. §§ 3E1.1(a) and (b)); and

4.    A downward adjustment of 3 offense levels based on global
      disposition (U.S.S.G. § 5K2.0).

Mr. Cali's Criminal History Category is I. This Offense Level/Criminal History Category

combination indicates a 6 to 12 month term of imprisonment (in Zone B) – *the minimum term of*

*which Mr. Cali has already served at the MDC and the Queens Facility.*

III.

THIS COURT SHOULD IMPOSE A
GUIDELINES SENTENCE OF TIME SERVED

Courts in the Second Circuit must: (A) determine the applicable Guidelines range;

and then (B) determine, based on all the 18 U.S.C. § 3553(a) factors, whether to impose a

Guidelines sentence or a non-Guidelines sentence. *See Gall*, --- U.S. at ---, 128 S.Ct. at 596-97;

*Crosby*, 397 F.3d at 113. Here and as detailed above, this Court should determine that Mr. Cali's

advisory Guidelines range is 6 to 12 months (level 10). We respectfully submit that a Guidelines

sentence of six months – in other words, the amount of time that Mr. Cali has *already served* – is

a fair, just and appropriate sentence for the following reasons:

First, a Guidelines sentence of time served comports with the purposes for which the Guidelines exist, and is sufficient, but not greater than necessary, to fulfill the goals of sentencing in 18 U.S.C. § 3553(a). *See Gall*, --- U.S. at ---, 128 U.S. at 594 ("even though the Guidelines are advisory rather than mandatory, they are . . . the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions"); *Rita v. United States*, --- U.S. ---, ---, 127 S.Ct. 2456, 2465 ("An individual judge who imposes a sentence within the range recommended by the Guidelines thus makes a decision that is fully consistent with the Commission's judgment in general"), *reh'g denied*, --- U.S. ---, 128 S.Ct. 19 (2007); *United States v. Fernandez*, 443 F.3d 19 (2d Cir.) ("We recognize that in the overwhelming majority of cases, a Guidelines sentence will fall comfortably within the broad range of sentences that would be reasonable in the particular circumstances"), *cert. denied*, --- U.S. ---, 127 S.Ct. 192 (2006).

Second, a Guidelines sentence of time served recognizes the strain and tension Mr. Cali has endured as a result of the six months of pretrial detention he has already served in the MDC (approximately one month) and the Queens Facility (approximately five months). *See United States v. Speed Joyeros, S.A.*, 204 F. Supp. 2d 412, 441 (E.D.N.Y. 2002) ("A court may depart if the defendant has suffered from unusual stress due to a lengthy or particularly stressful [pretrial] detention"); *United States v. Ekwunoh*, 888 F. Supp. 369, 373-74 (E.D.N.Y. 1994) (finding that the negative effects of pre-sentence incarceration warrant a downward departure). Indeed and pursuant to the policies of the Queens Facility, Mr. Cali (and all other detainees there) has been denied contact visits with his wife and three young children – something that even the MDC permits. Rather, Mr. Cali has had to communicate with his family (including his young children) on a phone through a glass partition.

Finally, a Guidelines sentence of time served accounts for the provisions of the "Second Chance Act," which was enacted on April 9, 2008 and amends 18 U.S.C. § 2624(c). *See* P.L. No. 110-199, 122 Stat. 692. The Second Chance Act expands the authority of the Director of the U.S. Bureau of Prisons to lengthen the time that federal inmates may spend outside federal correctional institutions at the end of their sentences. Here, a sentence of time served is appropriate because Mr. Cali likely would immediately qualify for release under the provisions of the Second Chance Act as he has already served six months of imprisonment.

## IV.

### IF THIS COURT DOES NOT IMPOSE A GUIDELINES SENTENCE OF TIME SERVED, IT SHOULD IMPOSE A NON-GUIDELINES SENTENCE OF TIME SERVED

If this Court does not impose a Guidelines sentence of time served or if this Court determines that Mr. Cali's advisory Guidelines offense level is higher than 10, it should still impose a sentence of time served based on the 18 U.S.C. § 3553(a) sentencing factors.

In this regard, it bears reiterating that sentencing judges today "enjoy considerable discretion in identifying grounds that can justify a non-Guidelines sentence." *Jones*, 2008 WL 2500252, at *7. *See also Jones*, 460 F.3d at 195 (sentencing judges are authorized to consider their "own sense of what is a fair and just sentence under all the circumstances"). Indeed, the "precise weight" accorded any relevant sentencing factor – *including the Guidelines themselves* – rests within the "discretion" of the sentencing court, and the Second Circuit "will not second-guess that determination in reviewing an otherwise reasonable sentence." *Marshall*, 186 Fed. Appx. at 128. Moreover, if this Court "conclude[s] that two sentences equally serve[] the statutory purposes of § 3553, it could not, consistent with the parsimony clause, impose the higher." *Ministro-Tapia*, 470 F.3d at 142.

19

First, a sentence of time served accurately reflects the nature and circumstances of Mr. Cali's offense. As detailed above, Mr. Cali's offense did not involve any threat of physical harm. Rather, it involved only the possibility of economic harm. Moreover, Mr. Cali's involvement in the NASCAR construction project (a scheme that was never actually consummated and from which Mr. Cali received no money) was limited and minor. *See*: (1) Point II(F), *supra*; and (2) Plea Agreement at 2 (reflecting the Government's agreement that Mr. Cali played a "minor role" in his offense and is entitled to a minor role adjustment of 2 offense levels pursuant to U.S.S.G. § 3B1.2(b)).[9]

Second, a sentence of time served accurately reflects Mr. Cali's history and characteristics. ████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ██████████████████████████. Mr. Cali is also a moderately successful businessman who built Bontel into the corporation that it is today (with healthy revenues for a small business and five employees). Unfortunately and due to his guilty plea, Mr. Cali had to dissociate himself from Bontel to ensure its continued viability and success. Mr. Cali, however, started a food and cardboard packaging company just months before his arrest, and intends to work to build that business when this matter is resolved and he is released from custody.

---

[9] Mr. Cali's minor role is further reflected by the Government's response to his severance motion. Specifically, the Government initially proposed trying Mr. Cali in its Group B, which it suggested should include seven RICO defendants and one non-RICO defendant. Mr. Cali filed an extensive severance motion arguing that he should be tried in Group E rather than Group B because of (among other things) his limited role in the charged offense. In response, the Government agreed, and consented to Mr. Cali's request, and the Court entered an order directing Mr. Cali's trial as part of Group E.

The Government's consent is significant in that it reflects its view as to the nature and circumstances of Mr. Cali's offense. Many defendants filed motions to move trial groups or otherwise sever their trials from those of their co-defendants. The Government, however, only consented to trial group changes for two defendants, one of whom was Mr. Cali.

Third, a sentence of time served is sufficient, but not greater than necessary, to reflect the seriousness of the offense and to provide for just punishment. Mr. Cali's involvement in the NASCAR construction project was limited to inquiring on behalf of one of his co-defendants concerning a company working on the NASCAR construction site. Mr. Cali had no direct communications with Vollaro and, in fact, Vollaro was a willing participant in the NASCAR construction project as he stood to profit handsomely from the volume of work required. Additionally, Mr. Cali has already been punished. Not only has he already been incarcerated for six months, but he also lost the business (Bontel) that he spent the past five years building.

Finally, any sentence (including a sentence of time served) is sufficient, but not greater than necessary, to afford adequate deterrence and to protect the public. Specifically, any sentence (regardless of length) will send the right message to anyone who might consider committing a similar offense that such conduct will be punished regardless of whether it involves actual threats of physical harm, regardless of whether it is successful, and regardless of an individuals' level of participation therein. Moreover, any sentence (including a sentence of time served) imposed on a 43 year old father of three young children will send the correct message to anyone who would consider committing a similar offense that it will be punished regardless of the age or personal circumstances of the offender. *See United States v. Nellum*, No. 2:04-CR-30-PS, 2005 WL 300073, at *3 (N.D. Ind. Feb. 3, 2005) (court varied from the Guidelines based, in part, on the defendant's age and the court's finding that the length of a term of imprisonment required to accomplish deterrence is inversely proportional to a defendant's age).

21

## CONCLUSION

For all of the foregoing reasons, we respectfully urge this Court to impose a sentence of time served.

Dated: New York, New York
      July 31, 2008

                                Respectfully submitted,

                                LAW OFFICES OF
                                HARLAN J. PROTASS, PLLC

By: _____
                      Harlan J. Protass (HP-2826)
                      305 Madison Avenue – Suite 1301
                      New York, New York 10165
                      T. 212-922-1080
                      F. 212-949-8255

                      *Counsel for Defendant Frank Cali*

<u>CERTIFICATE OF SERVICE</u>

The undersigned attorney hereby certifies that on July 31, 2008 I caused a true and correct copy

of the foregoing SENTENCING MEMORANDUM ON BEHALF OF FRANK CALI to be

served by hand delivery upon the following:

> Joseph Lipton, Esq.
> Roger Burlingame, Esq.
> Assistant United States Attorneys
> United States Attorney's Office
> Eastern District of New York
> 271 Cadman Plaza East
> Brooklyn, NY 11201

Harlan J. Protass